**ASSOCIATION OF NATIONAL ADVERTISERS, INC., et al.**

v.

**FEDERAL TRADE COMMISSION, et al., Appellants.**

No. 79–1117.

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1979.

Decided Dec. 27, 1979.

Certiorari Denied June 16, 1980. See 100 S.Ct. 3011.

---

Neil H. Koslowe, Sp. Litigation Counsel, Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Robert E. Kopp, Atty., Dept. of Justice, Michael N. Sohn, Gen. Counsel. Gerald P. Norton, Deputy Gen. Counsel, and David M. Fitzgerald, Atty., Federal Trade Commission, Washington, D.C., were on the brief, for appellants.

Frederick P. Furth, San Francisco, Cal., with whom Samuel H. Seymour, Washington, D.C., was on the brief, for appellee Kellogg Co.

Gilbert H. Weil, New York City, counsel for appellee Association of Nat. Advertisers, Inc., with whom William W. Rogal, Washington, D.C., counsel for appellee American Advertising Federation, and Walter L. Stratton, New York City, counsel for appellee American Association of Advertising Agencies, Inc., were on the brief, argued on behalf of appellees Association of National Advertisers, Inc., et al.

Mark L. Evans, Gen. Counsel, I.C.C., Jerome Nelson, Associate Gen. Counsel, I.C.C., Andrew Krulwich, Gen. Counsel, Consumer Product Safety Commission, and Robert R. Bruce, Gen. Counsel, Federal Communications Commission, Washington, D.C., were on the brief for amici curiae Independent Regulatory Agencies, urging that the judgment of the District Court on appeal herein be reversed in light of the alleged chilling effect that decision can have upon agency rulemaking proceedings.

Daniel J. Popeo and Joel D. Joseph, Washington, D.C., were on the brief for amicus curiae Washington Legal Foundation, urging affirmance.

David B. Lytle, Washington, D.C., was on the brief for amicus curiae Air Transport Association of America, urging that this court reject the recommendations proffered by the several Independent Regulatory Agencies as amici curiae herein.

Hope B. Eastman, Charles Morgan, Jr., and Paul F. Colarulli, Washington, D.C.,were on the brief for amicus curiae Grocery Manufacturers of America, Inc., urging affirmance.

Christopher S. Bond, Kansas City, Mo., and Charles A. Blackmar, Jefferson City, Mo., were on the brief for amicus curiae Great Plains Legal Foundation, urging affirmance.

Morton Hollander, Atty., Dept. of Justice, and Ann S. DuRoss, Asst. U. S. Atty., Washington, D. C., also entered appearances for appellants.

Earl C. Dudley, Jr., Washington, D. C., also entered an appearance for appellee Kellogg Co.

Joel J. McGrath, Jr., Washington, D. C., also entered an appearance for appellee American Ass'n of Advertising Agencies.

Before TAMM, LEVENTHAL,* and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

Concurring opinion filed by Circuit Judge LEVENTHAL.

Opinion dissenting in part and concurring in part filed by Circuit Judge MacKINNON.

TAMM, Circuit Judge:

 Plaintiffs, appellees here, brought an action in the United States District Court for the District of Columbia to prohibit Michael Pertschuk, Chairman of the Federal Trade Commission (Commission), from participating in a pending rulemaking proceeding concerning children's advertising. The district court, citing this court's decision in *Cinderella Career & Finishing Schools, Inc. v. FTC,* 138 U.S.App.D.C. 152, 425 F.2d 583 (D.C.Cir.1970), found that Chairman Pertschuk had prejudged issues involved in the rulemaking and ordered him disqualified. We hold that the *Cinderella* standard is not applicable to the Commission's rulemaking proceeding. An agency member may be disqualified from such a proceeding only when there is a clear and convincing showing that he has an unalterably closed mind on matters critical to the disposition of the rulemaking. Because we find that the appellees have failed to demonstrate the requisite prejudgment, the order of the district court is reversed.

I

On April 27, 1978, the Commission issued a Notice of Proposed Rulemaking that suggested restrictions regarding television advertising directed toward children.[1] The decision to commence rulemaking under section 18 of the Federal Trade Commission (FTC) Act[2] was accompanied by a state-

---

* Judge Leventhal died after completing his opinion in this case but before it was sent to the court's printer for publication.

1. The proposed rule would
 (a) Ban all televised advertising for any product which is directed to, or seen by, audiences composed of a significant proportion of children who are too young to understand the selling purpose of or otherwise comprehend or evaluate the advertising;
 (b) Ban televised advertising for sugared food products directed to, or seen by, audiences composed of a significant proportion of older children, the consumption of which

products poses the most serious dental health risks;
 (c) Require televised advertising for sugared food products not included in Paragraph (b), which is directed to, or seen by, audiences composed of a significant proportion of older children, to be balanced by nutritional and/or health disclosures funded by advertisers.
43 Fed.Reg. 17,967, 17,969 (1978).

2. 15 U.S.C. § 57a (1976). Congress enacted § 18 in 1975 as part of the Magnuson-Moss Warranty—Federal Trade Commission Im-

ment setting forth "with particularity the reason for the proposed rule." [3] The Commission explained that it had decided to propose a rule limiting children's advertising after consideration of a staff report that discussed

> facts which suggest that the televised advertising of any product directed to young children who are too young to understand the selling purpose of, or otherwise comprehend or evaluate, commercials may be unfair and deceptive within the meaning of Section 5 of the Federal Trade Commission Act, requiring appropriate remedy. The Report also discloses facts which suggest that the current televised advertising of sugared products directed to older children may be unfair and deceptive, again requiring appropriate remedy.

43 Fed.Reg. 17,967, 17,969 (1978) (footnotes omitted).[4] The Commission invited interested persons to comment upon any issue raised by the staff proposal.[5]

On May 8, 1978, the Association of National Advertisers, Inc. (ANA), the American Association of Advertising Agencies (AAAA), the American Advertising Federation (AAF), and the Toy Manufacturers of America, Inc. (TMA) petitioned Chairman Pertschuk to recuse himself from participation in the children's advertising inquiry. The petition charged that Pertschuk had made public statements concerning regulation of children's advertising that demonstrated prejudgment of specific factual issues sufficient to preclude his ability to serve as an impartial arbiter. *See* Appendix (A.) at 11, 15. The charges were based on a speech Pertschuk delivered to the Action for Children's Television (ACT) Research Conference in November 1977, on several newspaper and magazine articles quoting Chairman Pertschuk's views on children's television, on the transcript of a televised interview, and on a press release issued by the Commission during the summer of 1977.[6]

On July 13, 1978, Chairman Pertschuk declined to recuse himself from the proceeding. Pertschuk stated his belief that the disqualification standard appropriate for administrative adjudications did not apply to administrative rulemaking, *id.* at 57–58, and that, even if adjudicative criteria were relevant, his remarks did not warrant disqualification because they did not concern the petitioners in particular; rather, they addressed the "*issue* of advertising to children and the *policy* questions raised by it," *id.* at 64 (emphasis in original). Five days later, the Commission, without Pertschuk participating, also determined that Pertschuk need not be disqualified. *Id.* at 65.

In August 1978, ANA, AAAA, AAF, and TMA petitioned the district court to declare that Chairman Pertschuk should be disqualified from participating in the children's television proceeding. ANA, AAAA, AAF, and TMA also sought preliminary and permanent injunctions barring Pertschuk's participation and an order requiring the remaining Commissioners to reconsider all matters previously decided in the inquiry. The plaintiffs introduced copies of three letters, sent by Chairman Pertschuk on the day after he delivered the ACT speech, as additional evidence of his alleged prejudgment. The letters accompanied a copy of the speech.

On September 8, 1978, the Kellogg Company (Kellogg), a food manufacturer that

provement (Magnuson-Moss) Act, Pub.L.No. 93–637, § 202(a), 88 Stat. 2193 (1975).

**3.** 15 U.S.C. § 57a(b) (1976).

**4.** Petitions received from Action for Children's Television (ACT) and the Center for Science in the Public Interest prompted the Commission's decision to begin rulemaking. Each petition asked the Commission to promulgate rules limiting the advertising on children's television of certain highly sugared products. In support of the relief requested, each petition presented evidence on the amount of televised advertising for sugared products directed toward children, the limited ability of young children to recognize the commercial intent of such messages, and the health risks attendant to consumption by children of excess amounts of sugar. 43 Fed.Reg. at 17,968–69.

**5.** *Id.* at 17,969.

**6.** *See* note 56 *infra.*

advertises on television programs regularly viewed by children, moved to intervene as a plaintiff. The district court granted the motion on October 4, 1978. Two days later, Kellogg introduced as evidence in support of the motion for a preliminary injunction a copy of a letter sent by Chairman Pertschuk on November 17, 1977, to Donald Kennedy, Commissioner of the Food and Drug Administration.

On November 3, 1978, the district court ruled on cross-motions for summary judgment. The court, relying on *Cinderella,* found that Chairman Pertschuk "has prejudged and has given the appearance of having prejudged issues of fact involved in a fair determination of the Children's Advertising rulemaking proceeding." Accordingly, the .court granted the plaintiffs' motion for summary judgment and ordered Pertschuk enjoined from further participation. *Id.* at 110. This appeal followed.[7]

## II

■ Before we consider the merits of the district court's decision, we pause at a procedural way station. The Commission asserts that the district court erred in considering the disqualification issue before the rulemaking proceeding had ended. As a general matter, of course, the exhaustion doctrine provides that challenges to agency action should not be heard until relevant administrative proceedings have been concluded. *McKart v. United States,* 395 U.S. 185, 194–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). This permits an administrative agency to develop a factual record, to apply its expertise to that record, and to avoid piecemeal appeals. *Id.* at 193–94, 89 S.Ct. 1657.

■ Application of the exhaustion doctrine, however, is not inflexible. In rare circumstances, this court has considered extraordinary prejudgment claims prior to final agency action. *See Amos Treat & Co. v. SEC,* 113 U.S.App.D.C. 100, 306 F.2d 260 (D.C.Cir.1962). *See also Fitzgerald v.*

*Hampton,* 152 U.S.App.D.C. 1, 14, 467 F.2d 755, 768 (D.C.Cir.1972); *Sterling Drug, Inc. v. FTC,* 146 U.S.App.D.C. 237, 249–250, 450 F.2d 698, 710–11 (D.C.Cir.1971). The district court agreed to consider the present case prior to exhaustion of the administrative process on the basis of these decisions.

The exception to the exhaustion doctrine upon which the district court relied is extremely narrow. In *SEC v. R. A. Holman & Co.,* 116 U.S.App.D.C. 279, 281–282, 323 F.2d 284, 286–87 (D.C.Cir.1963), for example, this court refused to review a disqualification contention when a commissioner whose impartiality was challenged denied that he had participated in earlier administrative proceedings. This court noted that resolution of the disqualification issue would necessitate prolonged evidentiary hearings and, therefore, we concluded that review of the due process claim should follow final agency action. Similarly, in *Associated Press v. FCC,* 145 U.S.App.D.C. 172, 183–184, 448 F.2d 1095, 1106–07 (D.C.Cir. 1971), this court refused to review, prior to final administrative action, an insubstantial disqualification claim that involved conflicting factual contentions.

■ Although the doctrine that permits review of a disqualification claim prior to final agency action is restrictive, the present case falls within its bounds. As the Supreme Court has emphasized, application of the exhaustion doctrine "requires an understanding of its purposes and of the particular administrative scheme involved." *McKart v. United States,* 395 U.S. at 193, 89 S.Ct. at 1662. For the following reasons, we find that immediate review of the prejudgment claim will not thwart the purposes of exhaustion.

First, the challenge to Chairman Pertschuk's further participation involves no disputed factual issues that demand the creation of a better administrative record. The agency has had an adequate opportunity to explain why Chairman Pertschuk need

---

7. The Washington Legal Foundation and seven independent regulatory agencies appeared as amici curiae before this court.

not be recused.[8] Second, the issue involved in this case—the prejudgment standard required by due process for section 18 rulemaking—is a pure question of law. The Commission can bring no particular expertise to bear on its determination. Consideration of this question of first impression will not necessarily permit future piecemeal attacks on administrative processes.[9] Under the particular circumstances of this case, we therefore conclude that the appellees' claim may be heard.

▆▆▆ Judge Leventhal, in his concurring opinion, voices some concern over the jurisdiction of the district court to entertain this action. In their complaints, however, the plaintiffs alleged a violation of their procedural rights under the Constitution and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–706 (1976). Thus, the district court clearly had jurisdiction—i. e., power—to resolve the controversy under 28 U.S.C. § 1331(a) (1976) (cases arising under the Constitution and the laws of the United States) and 28 U.S.C. § 1337 (1976) (cases arising under statutes regulating commerce). See generally Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Once a plaintiff has alleged a nonfrivolous constitutional claim, the district court has jurisdiction under section 1331, and dismissal for want of jurisdiction is improper even if dismissal for failure to

state a claim upon which relief could be granted would be proper. Bell v. Hood, 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946). See 1 Moore's Federal Practice ¶ 0.62[2.–2], at 664–65 (1977). Similarly, jurisprudential concerns, such as those embodied in the exhaustion doctrine, do not bear on whether a court has jurisdiction but only on whether it should exercise that jurisdiction.

This conclusion finds support in this court's opinion in Wolf Corp. v. SEC, 115 U.S.App.D.C. 75, 317 F.2d 139 (D.C.Cir.1963) (Burger, J.). The plaintiff in that case had asked the district court to enjoin the Securities and Exchange Commission from holding a stop-order hearing. The district court dismissed the case not for want of jurisdiction but for failure to state a claim upon which relief could be granted. Id., at 77, 317 F.2d at 141. On appeal, this court affirmed because it believed the plaintiff should have exhausted its remedies before the agency first. In the process, the court stated expressly that the plaintiff's allegation of a due process violation was sufficient to invoke the district court's jurisdiction under 28 U.S.C. § 1337. It then agreed that dismissal for failure to state a valid claim, rather than for want of jurisdiction, was appropriate. Id. Moreover, like the case before us, Wolf arose under a proce-

---

**8.** When the Commission rejected the disqualification claim, the appellees had not yet presented as evidence of prejudgment four letters later introduced before the district court. See pp. ——–—— of 201 U.S.App.D.C., pp. 1155–1156 of 627 F.2d supra. The Commission did, however, have the opportunity to analyze the appellees' legal theory and to examine the bulk of their evidence. We do not view the presence of the letters, which merely repeat the views expressed in the ACT speech, as having decisional significance. See note 56 infra.

**9.** In this sense, review of the Commission's decision not to recuse Chairman Pertschuk is analogous to the interlocutory review of a district court order permitted under 28 U.S.C. § 1292(b) (1976) when the "order involves a controlling question of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation." See also Kennedy, The Federal Courts Improvement Act: a first step

for Congress to take, 63 Judicature 8, 12 (1979) (proposed S. 678 balances need for finality against desirability of hearing interlocutory appeals by allowing "immediate appeals in cases of 'extraordinary importance,' with the Court of Appeals deciding—even in the absence of district court certification—whether or not to entertain an appeal").

Similarly, appellate courts reviewing claims that a district court judge improperly refused to recuse himself, see 28 U.S.C. §§ 144, 455 (1976), have demonstrated sensitivity to the expeditious hearing of prejudgment cases. Although a refusal to recuse is not appealable as a final order, commentators have detected a liberal trend toward use of mandamus to consider disqualification claims. See 13 C. Wright & A. Miller, Federal Practice and Procedure: Jurisdiction § 3553, at 387 (1975); 9 Moore's Federal Practice ¶ 110.13[10], at 187–88 (2d ed. 1975).

dural regime that provided for review of final agency decisions in the courts of appeals, not the district courts. *Compare* 15 U.S.C. § 77i (1976) (review of SEC orders), *cited in Wolf Corp. v. SEC,* 115 U.S.App. D.C. at 77 n.6, 317 F.2d at 141 n.6, *with* 15 U.S.C. § 57a(e)(1)(A) (1976) (review of FTC rules). Thus, where the final agency decision may be reviewed does not by itself determine the court in which a plaintiff seeking interlocutory relief may pursue his cause of action.

### III

The Commission attacks the substance of the district court's decision on two grounds. First, it insists that the standard for disqualification of an administrative decisionmaker in rulemaking differs from the standard in adjudication. The Commission's view rests on the different purposes of rulemaking and adjudication and on the longstanding rule that due process requirements are not the same in the two contexts. Second, the Commission asserts that under any disqualification standard, Chairman Pertschuk cannot be found to have prejudged issues in contravention of due process.

The appellees respond with two contentions. First, they support the district court's conclusion that *Cinderella Career & Finishing Schools, Inc. v. FTC,* 138 U.S.App. D.C. 152, 425 F.2d 583 (D.C.Cir. 1970), applies to Commission rulemaking under section 18 of the FTC Act. Although *Cinderella* involved an adjudication, the appellees claim that the existence of procedures in section 18 rulemaking proceedings that are not required in informal notice-and-comment rulemaking under section 553 of the Administrative Procedure Act, 5 U.S.C. § 553 (1976),[10] mandates application of the standard set out in that case. Second, they argue that Chairman Pertschuk's statements indicate prejudgment sufficient to bar him from further participation in the children's advertising proceeding.

10. *See* note 35 *infra.*

11. Section 5(a)(1) provides that "[u]nfair methods of competition in or affecting commerce,

We are, therefore, called upon to resolve two questions: (1) What is the appropriate standard by which to decide prejudgment in the context of a section 18 proceeding? (2) Has Chairman Pertschuk made statements that demonstrate prejudgment under that standard?

### A

Before we examine either the structure of section 18 or the content of Pertschuk's statements, we review our decision in *Cinderella Career & Finishing Schools, Inc. v. FTC.* In *Cinderella,* we held that the standard for disqualifying an administrator in an adjudicatory proceeding because of prejudgment is whether " 'a disinterested observer may conclude that [the decisionmaker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.' " 138 U.S.App.D.C. at 160, 425 F.2d at 591 (quoting *Gilligan, Will & Co. v. SEC,* 267 F.2d 461, 469 (2d Cir.), *cert. denied,* 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959)). *See Texaco, Inc. v. FTC,* 118 U.S.App.D.C. 366, 372, 336 F.2d 754, 760 (D.C.Cir.1964), *vacated and remanded per curiam on other grounds,* 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714 (1965). *See also Kennecott Copper Corp. v. FTC,* 467 F.2d 67, 80 (10th Cir. 1972), *cert. denied,* 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974). This standard guarantees that the adjudicative hearing of a person facing administrative prosecution for past behavior is before a decisionmaker who has not prejudged facts concerning the events under review.

The facts of the *Cinderella* case illustrate application of the standard. The Commission charged that Cinderella Career College and Finishing Schools, Inc. (Cinderella) made false representations in its advertising and engaged in deceptive practices in contravention of section 5 of the FTC Act, 15 U.S.C. § 45 (1976).[11] For example, the

and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." 15 U.S.C. § 45(a)(1) (1976). The Magnuson-Moss Act amended § 5 by adding the words "or

Commission alleged that Cinderella advertised "courses of instruction which qualify students to become airline stewardesses" and that its graduates were "qualified to assume executive positions." 138 U.S.App. D.C. at 153 n.1, 425 F.2d at 584 n.1. An administrative law judge ruled that the Commission had failed to prove that the acts and practices violated the FTC Act, and he dismissed the complaint. *Id.* at 153 n.2, 425 F.2d at 584 n.2. Complaint counsel appealed the administrative law judge's decision to the full Commission.

While the appeal was pending before the Commission, Chairman Paul Rand Dixon spoke at the Government Relations Workshop of the National Newspaper Association and stated:

> What kind of vigor can a reputable newspaper exhibit? . . . What standards are maintained on advertising acceptance? . . . What about carrying ads that offer college educations in five weeks, . . . or becoming an airline's hostess by attending a charm school? . . . Granted that newspapers are not in the advertising policing business, their advertising managers are savvy enough to smell deception when the odor is strong enough.

*Id.,* at 158–159, 425 F.2d at 589–90. Six months later, the Commission, with Chairman Dixon participating, found that Cinderella neither awarded nor was capable of awarding academic degrees, and that it offered no course of instruction that would qualify students as airline stewardesses. *School Services, Inc.,* 74 F.T.C. 920, 1022, 1031, 1035 (1968). The Commission concluded that these and other representations were false and misleading in violation of section 5 of the FTC Act and ordered Cinderella to cease and desist from such practices. *Id.* at 1040–42.

affecting." Pub.L.No. 93–637, § 201(a), 88 Stat. 2193 (1975).

**12.** 15 U.S.C. § 57a(a)(1) (1976).

**13.** 15 U.S.C. § 45(a)(1) (1976).

**14.** The appellees also argue that

On review, we found that Chairman Dixon's remarks gave "the appearance that he ha[d] already prejudged the case and that the ultimate determination of the merits [would] move in predestined grooves." 138 U.S.App.D.C. at 159, 425 F.2d at 590. Accordingly, we held that Chairman Dixon's participation in the proceeding required reversal and remand of the Commission's order.

B

The district court in the case now before us held that "the standard of conduct delineated in *Cinderella* " governs agency decisionmakers participating in a section 18 proceeding. A. at 107. Section 18 authorizes the Commission to promulgate rules designed to "define with specificity acts or practices which are unfair or deceptive." [12] Basically, it allows the Commission to enforce the broad command of section 5 of the FTC Act, which declares "unfair or deceptive acts or practices in or affecting commerce . . . unlawful." [13] The district court ruled that a section 18 proceeding, notwithstanding the appellation rulemaking, "is neither wholly legislative nor wholly adjudicative." According to the district court, the "adjudicative aspects" of the proceeding render *Cinderella* applicable. *Id.* at 106.

The appellees urge us to uphold the district court's analysis of section 18. They emphasize two allegedly "adjudicatory aspects" of a section 18 proceeding: (1) interested persons are entitled to limited cross-examination of those who testify to disputed issues of material fact, *see* 15 U.S.C. § 57a(c)(1)(B) (1976), and (2) a reviewing court must set aside any rule not supported by substantial evidence in the rulemaking record taken as a whole, *see* 15 U.S.C. § 57a(e)(3)(A) (1976).[14]

> the principal characteristic of adjudicative proceedings which necessitates the *Cinderella* prejudgment standard is the requirement (which traditionally has applied to judges but not to legislators) that the ultimate decision be based upon record evidence. This, of course, is one of the most significant characteristics which the Commission's adjudica-

The district court's characterization of section 18 rulemaking as a "hybrid" or quasi-adjudicative proceeding, A. at 106, ignores the clear scheme of the APA. Administrative action pursuant to the APA is either adjudication or rulemaking. The two processes differ fundamentally in purpose and focus:

> The object of the rule making proceeding is the implementation or prescription of law or policy for the future, rather than the evaluation of a respondent's past conduct. Typically, the issues relate not to the evidentiary facts, as to which the veracity and demeanor of witnesses would often be important, but rather to the ·policy-making conclusions to be drawn from the facts. . . . Conversely, adjudication is concerned with the determination of past and present rights and liabilities. Normally, there is involved a decision as to whether past conduct was unlawful, so that the proceeding is characterized by an accusatory flavor and may result in disciplinary action.

Attorney General's Manual on the Administrative Procedure Act 14 (1947).[15] *See United States v. Florida East Coast Railway*, 410 U.S. 224, 244–46, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

Adjudication and rulemaking may be conducted pursuant to either informal or formal procedures.[16] Informal rulemaking requires the administrative agency to provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."

5 U.S.C. § 553(c). Under section 706(2)(A), reviewing courts are required to uphold informal rulemaking decisions unless those decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976).

Formal rulemaking is invoked when "rules are required by statute to be made on the record after opportunity for an agency hearing." 5 U.S.C. § 553(c). Under sections 556 and 557 of the APA, 5 U.S.C. §§ 556–557 (1976), formal rulemaking must include a trial-type hearing at which a "party is entitled to present his case or defense or oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." 5 U.S.C. § 556(d). Section 706(2)(E) governs judicial review of formal rulemaking and requires a court to set aside a rule that is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E).

Formal adjudication is governed by section 554 of the APA and arises in "every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a) (1976). Section 554 incorporates the procedural requirements of sections 556 and 557 and affords parties to a formal adjudication the right to present evidence and to conduct cross-examination. 5 U.S.C. § 554(c)–(d). Judicial review of formal adjudication, like that of formal rulemaking,

---

tive proceedings and its Section 18 trade regulation rulemaking proceedings have in common.
Brief of Intervening Plaintiff-Appellee Kellogg Company at 38. The appellees' attempt to equate rulemaking with adjudication on the basis of a record requirement would have more force, however, if § 18 demanded rulemaking decisions to be based on a closed record, as are adjudicatory determinations. *See* 5 U.S.C. § 556(e) (1976). Section 18, in fact, provides that for· purposes of judicial review the "rulemaking record" includes "any . . . information which the Commission considers relevant to such rule." 15 U.S.C. § 57a(e)(1)(B) (1976). Section 18 thus does not prohibit re-

liance on material not adduced during the rulemaking proceedings; it simply requires the Commission to acknowledge that reliance.

**15.** The Attorney General's Manual on the Administrative Procedure Act is a contemporaneous interpretation of the Administrative Procedure Act. Because of "the role played by the Department of Justice in drafting the legislation," it deserves some deference. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 546, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978) (footnote omitted).

**16.** *See* Pedersen, *Formal Records and Informal Rulemaking*, 85 Yale L.J. 38, 40 n.14 (1975).

is governed by the substantial evidence standard.[17]

The foregoing descriptions merely outline the basic parameters of administrative action. Congress has, in the Magnuson-Moss Warranty—Federal Trade Commission Improvement (Magnuson-Moss) Act § 202(a), 15 U.S.C. § 57a (1976), and elsewhere,[18] enacted specific statutory rulemaking provisions that require more procedures than those of section 553 but less than the full procedures required under sections 556 and 557.[19] The presence of procedures not mandated by section 553, however, does not, as the appellees urge, convert rulemaking into quasi-adjudication. The appellees err by focusing on the details of administrative process rather than the nature of administrative action.

■ Our decision in *Hercules, Inc. v. EPA*, 194 U.S.App.D.C. 172, 598 F.2d 91 (D.C.Cir.1978), illustrates that the difference between rulemaking and adjudication is not affected by varying procedural practices. In that case, although we reviewed decisions of the Environmental Protection Agency under the substantial evidence standard, *id.*, at 187, 598 F.2d at 106; *see Environmental Defense Fund v. EPA (PCBs)*, 194 U.S.App.D.C. 143, 163–164, 598 F.2d 62, 82–83 (D.C.Cir.1978), we refused to find that the agency proceeding was adjudicatory. The Environmental Protection Agency was promulgating policy-based standards of general import and, thus, was engaged in rulemaking. Similarly, the Commission's children's advertising inquiry is designed to determine whether certain acts or practices will, in the future, be considered to contravene the FTC Act. The

proceeding is not adjudication or quasi-adjudication. It is a clear exercise of the Commission's rulemaking authority.

## C

The appellees also argue that we must apply *Cinderella* because it involves a factual prejudgment similar to the one now before us. In *Cinderella*, Chairman Dixon made statements that reflected prejudgment that Cinderella Career & Finishing Schools, Inc. had engaged in certain acts. In this case, the appellees accuse Chairman Pertschuk of prejudging issues of material fact in the children's television proceeding. We find that the appellees' argument belies a misunderstanding of the factual basis of rules.

The factual predicate of a rulemaking decision substantially differs in nature and in use from the factual predicate of an adjudicatory decision. The factual predicate of adjudication depends on ascertainment of "facts concerning the immediate parties—who did what, where, when, how, and with what motive or intent." 2 K. Davis, *Administrative Law Treatise*, § 15.-03, at 353 (1958). By contrast, the nature of legislative fact is ordinarily general, without reference to specific parties. Adjudicative and legislative facts are also used differently:

> [A]djudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case. . . . Legislative facts are the facts which help the tribunal determine the content of law

**17.** To complete the symmetry, informal adjudication occurs when an agency determines the rights or liabilities of a party in a proceeding to which § 554 does not apply. *See, e. g., Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam); *Aircraft Owners & Pilots Ass'n v. FAA,* 195 U.S.App.D.C. 151, 155–56, 600 F.2d 965, 969–70 (D.C.Cir.1979).

**18.** *See, e. g.,* Consumer Product Safety Act § 9, 15 U.S.C. § 2058 (1976); Toxic Substances Control Act § 6, 15 U.S.C. § 2605 (1976); Occupational Safety and Health Act of 1970, § 6, 29

U.S.C. § 655 (1976); Department of Energy Organization Act § 501, 42 U.S.C. § 7191 (Supp. I 1977); Clean Air Act Amendments of 1977, § 305, 42 U.S.C. § 7607 (Supp. I 1977). *See also* 1 K. Davis, *Administrative Law Treatise* § 6:9 (2d ed. 1978).

**19.** Section 18, for example, affords a more limited right of cross-examination than § 556. *Compare* 15 U.S.C. § 57a(c) *with* 5 U.S.C. § 556(d). *See* H.R.Rep.No. 93–1606, 93d Cong., 2d Sess. 33 (1974) (Conference Report).

and of policy and help the tribunal to exercise its judgment or discretion in determining what course of action to take. *Id.*[20] Thus, legislative facts are crucial to the prediction of future events and to the evaluation of certain risks, both of which are inherent in administrative policymaking.

The case law demonstrates that the factual component of generalized rulemaking cannot be severed from the pure policy aspects of the rule.[21] *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978), is illustrative. There, the Supreme Court reviewed the Federal Communication Commission's decision to order prospective divestiture in cases of newspaper-television cross-ownership. The agency had based its decision on an assessment of the relevant market conditions. The Court, upholding the administrative action, stated that "complete factual support in the record for the [Federal Communication] Commission's

judgment or prediction is not possible or required; 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.'" *Id.* at 814, 98 S.Ct. at 2122 (quoting *FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961)). *See American Airlines, Inc. v. CAB,* 123 U.S. App.D.C. 310, 359 F.2d 624 (D.C.Cir.1966) (en banc).[22]

Because legislative facts combine empirical observation with application of administrative expertise to reach generalized conclusions, they need not be developed through evidentiary hearings. *See id.,* at 318–319, 359 F.2d at 632–33.[23] To the contrary, however, "[w]here adjudicative, rather than legislative, facts are involved, the parties must be afforded a hearing to allow them an opportunity to meet and to present evidence." *Alaska Airlines, Inc. v. CAB,* 178 U.S.App.D.C. 116, 122, 545 F.2d 194, 200 (D.C.Cir.1976) (footnote omitted). This dis-

---

20. *See* Davis, *Judicial Notice,* 55 Colum.L.Rev. 945, 952–59 (1955); Davis, *An Approach to Problems of Evidence in the Administrative Process,* 55 Harv.L.Rev. 364, 404–07 (1942).

The distinction between legislative and adjudicative facts has been widely accepted both within and without this circuit. *See, e. g., Drummond v. Fulton County Dep't of Family & Children's Servs.,* 563 F.2d 1200, 1210 (5th Cir. 1977) (en banc); *Alaska Airlines, Inc. v. CAB,* 178 U.S.App.D.C. 116, 122, 545 F.2d 194, 200 (D.C.Cir.1976); *Zamora v. Immigration & Naturalization Serv.,* 534 F.2d 1055, 1062 & n.4 (2d Cir. 1976); *Independent Bankers Ass'n v. Federal Reserve Sys.,* 170 U.S.App.D.C. 278, 291–294, 516 F.2d 1206, 1219–22 (D.C.Cir.1975); *Washington Util. & Transp. Comm'n v. FCC,* 513 F.2d 1142, 1165 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); *American Bancorporation v. Federal Reserve Sys.,* 509 F.2d 29, 36–37 (8th Cir. 1974); *Thompson v. Washington,* 162 U.S.App.D.C. 39, 51 n.4, 497 F.2d 626, 638 n.4 (D.C.Cir.1973); *SEC v. Frank,* 388 F.2d 486, 491–92 (2d Cir. 1968); *Marshall v. Sawyer,* 365 F.2d 105, 111 (9th Cir. 1966); *Dayco Corp. v. FTC,* 362 F.2d 180, 186 (6th Cir. 1966); *American Airlines, Inc. v. CAB,* 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633 (D.C.Cir.1966) (en banc).

21. *See also Ethyl Corp. v. EPA,* 176 U.S.App. D.C. 373, 409–10, 423 n.112, 541 F.2d 1, 37–38, 51 n.112 (D.C.Cir.) (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976);

*Industrial Union Dep't, AFL–CIO v. Hodgson,* 162 U.S.App.D.C. 331, 339, 499 F.2d 467, 475 (D.C.Cir.1974).

22. In *American Airlines,* we reviewed a Civil Aeronautics Board (Board) decision that allowed all-cargo airlines—but not passenger airlines—to offer reserved cargo space at reduced rates. The Board had designed the reserved space service in an effort to increase the commercial use of airlines. The Board feared that the success of the program would be threatened, and the financial strength of all-cargo airlines weakened, if passenger airlines were to offer the service as well. Further, the Board assumed that the financial effect of the new program on all-passenger airlines would not be significant. 123 U.S.App.D.C. at 312–313, 359 F.2d at 626–627. The court deemed this last finding a "'legislative'" fact and rejected an attack on the Board's position explaining: "It is the kind of issue involving expert opinions and forecasts, which cannot be decisively resolved by testimony. It is the kind of issue where a month of experience will be worth a year of hearings." *Id.* at 319, 359 F.2d at 633.

23. *See also Independent Bankers Ass'n v. Federal Reserve Sys.,* 170 U.S.App.D.C. 278, 291–294, 516 F.2d 1206, 1219–22 (D.C.Cir.1975). *See generally Zamora v. Immigration & Naturalization Serv.,* 534 F.2d 1055, 1062 (2d Cir. 1976).

tinction has been established in judicial, as well as administrative, processes.[24]

Evidentiary hearings, although not necessary to determine legislative facts, nevertheless may be helpful in certain circumstances. For example, Congress, when it enacted the Magnuson-Moss Act, recognized that special circumstances might warrant the use of evidentiary proceedings in determining legislative facts. Under section 18(c)(1)(B) [25] and section 18(c)(2)(B),[26] the Commission must conduct a hearing, with a limited right of cross-examination, when it resolves disputed issues of material fact. The legislative history of the Magnuson-Moss Act states that "[t]he only disputed issues of material fact to be determined for resolution by the Commission are those issues characterized as issues of specific fact in contrast to legislative fact." H.R. Rep.No. 93–1606, 93d Cong., 2d Sess. 33 (1974) (Conference Report).

Although neither the Conference Report nor subsequent congressional debate amplify the term "specific fact," its genesis can be traced to a recommendation of the Administrative Conference of the United States (ACUS).[27] Prior to congressional action on the Magnuson-Moss Act, ACUS promulgated Recommendation No. 72–5, which suggested that Congress should not require

---

**24.** The Advisory Committee for the Federal Rules of Evidence embraced the general rule that legislative facts need not be developed through evidentiary hearings. Rule 201 of the Federal Rules of Evidence governs judicial notice of adjudicative facts. No evidentiary rule refers to judicial notice of legislative facts because, as the Advisory Committee noted, "any limitation in the form of indisputability, any formal requirements of notice other than those already inherent in affording opportunity to hear and be heard and exchanging briefs, and any requirement of formal findings at any level" are inappropriate to judicial access to legislative facts. Fed.R.Evid. 201 note.

Courts consistently have considered legislative facts that were not the product of trial-type proceedings. In *Muller v. Oregon*, 208 U.S. 412, 421–22, 28 S.Ct. 324, 326, 52 L.Ed. 551 (1908), for example, the Supreme Court took "judicial cognizance of all matters of general knowledge" in upholding a state law that prohibited women from working more than ten hours a day in a laundry. The Court principally relied upon a brief, filed by Louis Brandeis, that set forth support for the proposition that long working hours were physically dangerous to women. For other examples of judicial notice of legislative fact, see *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63, 93 S.Ct. 2628, 2638, 37 L.Ed.2d 446 (1973) ("a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex"); *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) ("women still face pervasive, although at times more subtle, discrimination in our educational institutions, in the job market and, perhaps most conspicuously, in the political arena"); *Javins v. First Nat'l Realty Corp.*, 138 U.S.App. D.C. 369, 375–77, 428 F.2d 1071, 1078–80 (D.C. Cir.) ("Tenants have very little leverage to enforce demands for better housing. . . .

The increasingly severe shortage of adequate housing further increases the landlord's bargaining power and escalates the need for maintaining and improving the existing stock.") (footnote omitted), *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).

**25.** Section 18(c)(1)(B) provides that

an interested person is entitled . . . if the Commission determines that there are disputed issues of material fact it is necessary to resolve, to present such rebuttal submissions and to conduct (or have conducted under paragraph (2)(B)) such cross-examination of persons as the Commission determines (i) to be appropriate, and (ii) to be required for a full and true disclosure with respect to such issues.

15 U.S.C. § 57a(c)(1)(B).

**26.** Section 18(c)(2)(B) provides that the Commission may prescribe rules that include

requirements that any cross-examination to which a person may be entitled under paragraph (1) be conducted by the Commission on behalf of that person in such manner as the Commission determines (i) to be appropriate, and (ii) to be required for a full and true disclosure with respect to disputed issues of material fact.

15 U.S.C. § 57a(c)(2)(B).

**27.** The Administrative Conference of the United States (ACUS) is empowered to study administrative procedure and to make recommendations about administrative procedure to the President, the Congress, or the Judicial Conference of the United States. 5 U.S.C. § 574(1) (1976). Congress specifically asked ACUS to study and to evaluate the procedures of § 18. *See* Magnuson-Moss Act, Pub.L.No. 93–637, § 202(d), 88 Stat. 2198 (1975), *as amended by* Act of Nov. 1, 1978, Pub.L.No. 95–558, 92 Stat. 2130, *reprinted in* 15 U.S.C.A. § 57a note (West Supp. 1979).

trial-type procedures "for making rules of general applicability, except that it may sometimes appropriately require such procedures for resolving issues of specific fact." 1 C.F.R. § 305.72–5 (1974). In a letter dated July 27, 1973, then-ACUS Chairman Antonin Scalia answered Congressman Moss's request for a definition of the term "specific fact":

> Conference Recommendation 72–5 is addressed exclusively to agency rulemaking of *general* applicability. In such a proceeding, almost by definition, adjudicative facts are not at issue, and the agency should ordinarily be free to, and ordinarily would, proceed by the route of written comments, supplemented, perhaps, by a legislative-type hearing. Yet there may arise occasionally in such rulemaking proceedings factual issues which, though not adjudicative, nevertheless justify exploration in a trial-type format— because they are sufficiently narrow in focus and sufficiently material to the outcome of the proceeding to make it reasonable and useful for the agency to resort to trial-type procedure to resolve them. These are what the Recommendation refers to as issues of specific fact.[28]

A review of this and subsequent ACUS correspondence demonstrates that the term "specific fact" refers to a category of legislative fact, the resolution of which may be aided by the type of adversarial procedures inherent in an evidentiary proceeding with limited cross-examination. *See Citizens for Allegan County v. FPC,* 134 U.S.App.D.C. 229, 233, 414 F.2d 1125, 1129 (D.C.Cir. 1969).[29] Nothing in the legislative history or background of section 18 suggests, however, that Congress believed that the use of evidentiary hearings transformed the nature of the proceedings from rulemaking to adjudication or altered the factual predicate of rulemaking from legislative to adjudicative fact. Accordingly, the appellees' contention that the *Cinderella* standard must be applied to section 18 rulemaking because it invokes the same type of factual judgments as Commission adjudication is simply incorrect.

### D

Our conclusion that neither the procedures nor the factual predicate of section 18 rulemaking converts it into adjudication is supported by *United States v. Florida East Coast Railway,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). In that case, the Su-

---

**28.** Appellants' Supplemental Memorandum, Attachment 8, at 2.

**29.** While the House version of the Magnuson-Moss Act was pending, Chairman Scalia commented upon the bill, which at that time allowed cross-examination "as may be required for a full and true disclosure of all disputed issues of material fact." *See* H.R.Rep.No. 93–1107, 93d Cong., 2d Sess. 13 (1974), U.S.Code Cong. & Admin.News 1974, p. 7702, Scalia suggested that the proposed House provision would be unworkable because it would routinely require use of "a procedural technique designed for the resolution of particularized factual disputes" in the formulation of generally applicable rulemaking. Appellants' Supplemental Memorandum, Attachment 9, at 1. Scalia noted, however, that evidentiary proceedings might be appropriate for the resolution of "specific facts." *Id.* at 2. Chairman Scalia's successor, Robert Anthony, repeated these views in a subsequent letter to Congressman Staggers, a member of the Conference Committee. Appellants' Supplemental Memorandum, Attachment 10.

The Conference Committee changed § 18 to allow cross-examination if there "are disputed issues of material fact, and . . . it is necessary to resolve such issues." *See* H.R.Rep. No.93–1606, *supra* note 19, at 33. As we previously noted, the Conference Report defined material issues of disputed fact as specific fact. *See* pp. —— –—— of 201 U.S.App.D.C., pp. 1163–1164 of 627 F.2d *supra.* After the final version of the Magnuson-Moss Act passed both houses of Congress, but prior to presidential action, the Office of Management and Budget requested ACUS's comments on the bill. ACUS Executive Secretary Richard K. Berg stated:

> If the courts look to the Conference report as an authoritative interpretation of the statutory phrase "disputed issues of fact," the problem of the Commission bogging down in excessive trial-type procedures is greatly reduced. Since consideration of many, if not most proposed rules of general applicability involve exclusively questions of legislative fact, the Commission would often be able to dispense with cross-examination entirely.

Appellants' Supplemental Memorandum, Attachment 11, at 2.

preme Court held, over the protests of two dissenting Justices, that an Interstate Commerce Commission ratemaking proceeding was rulemaking. The dissent maintained that the rate order was "adjudicatory in the sense that [it] determine[d] the measure of the financial responsibility of one road for its use of the rolling stock of another road." *Id.* at 252, 93 S.Ct. at 824 (Douglas, J., joined by Stewart, J., dissenting). The dissent emphasized that the agency decision was based on "evidential facts," *id.* at 254, 93 S.Ct. at, and that it could "have devastating effects on a particular [railroad] line," *id.* at 256, 93 S.Ct. at 826. Nevertheless, the Court found that the proceeding was rulemaking because the agency final order was applicable to all common carriers rather than any particular railroad. The Court explained that the agency had predicated its decision on "factual inferences . . . used in the formulation of a basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts." *Id.* at 246, 93 S.Ct. at 821.

■ The same analysis applies to section 18 rulemaking. A section 18 proceeding is directed to all members of an affected industry and is based on legislative fact. Even when evidentiary procedures are employed in the formulation of specific fact, the product of those procedures is "used in the formulation of a basically legislative-type judgment." *Id.* Although we recognize that the line between rulemaking and adjudication "may not always be a bright one," *id.* at 245, 93 S.Ct. at 821, we have no doubt that section 18 proceedings fall clearly on the rulemaking side of the "recognized distinction in administrative law between proceedings for the purpose of pro-

mulgating policy-type rules . . . on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *Id.* Accordingly, we now decide the standard of disqualification applicable in a section 18 rulemaking proceeding.

### IV

### A

Had Congress amended section 5 of the FTC Act to declare certain types of children's advertising unfair or deceptive, we would barely pause to consider a due process challenge. No court to our knowledge has imposed procedural requirements upon a legislature before it may act. Indeed, any suggestion that congressmen may not prejudge factual and policy issues is fanciful. A legislator must have the ability to exchange views with constituents and to suggest public policy that is dependent upon factual assumptions. Individual interests impinged upon by the legislative process are protected, as Justice Holmes wrote, "in the only way that they can be in a complex society, by [the individual's] power, immediate or remote, over those who make the rule." *Bi-Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915).

■ Congress chose, however, to delegate its power to proscribe unfair or deceptive acts or practices to the Commission because "there were too many unfair practices for it to define." S.Rep.No. 597, 63d Cong., 2d Sess. 13 (1914).[30] In determining the due process standards applicable in a section 18 proceeding, we are guided by its nature as rulemaking.[31] When a proceeding is classified as rulemaking, due process

**30.** Rulemaking under the APA similarly embodies the delegation of legislative authority to administrative agencies. During debate preceding passage of the APA, Representative Walters, chairman of the subcommittee that reported the APA to the House, *see* 92 Cong. Rec. 5655 (1946), explained that rulemaking encompasses

the legislative functions of administrative agencies, where they issue general or particular regulations which in form or effect are

like the statutes of the Congress. . . . Congress—if it had the time, the staff, and the organization—might itself prescribe these things. Because Congress does not do so itself and yet desires that these things be done, the legislative power to do them has been conferred upon administrative officers or agencies.

*Id.* at 5648.

**31.** *See Cafeteria & Restaurant Workers Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct.

ordinarily does not demand procedures more rigorous than those provided by Congress. *See Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 524 & n. 1, 542 & n. 16, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Congress is under no requirement to hold an evidentiary hearing prior to its adoption of legislation, and "Congress need not make that requirement when it delegates the task to an administrative agency." *Bowles v. Willingham,* 321 U.S. 503, 519, 64 S.Ct. 641, 649, 88 L.Ed. 892 (1944) (citing *Bi-Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915)). Accordingly, we must apply a disqualification standard that is consistent with the structure and purposes of section 18.

Congress regarded the authority to promulgate rules pursuant to section 18 as

1743, 1748, 6 L.Ed.2d 1230 (1961) ("[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation").

**32.** The Conference Report explained that "[b]ecause the prohibition of section 5 of the Act is so broad, trade regulation rules are needed to define with specificity conduct that violates the statute and to establish requirements to prevent unlawful conduct." H.R.Rep.No. 93–1606, *supra* note 19, at 31.

**33.** Two commentators have explained the practical significance of the Commission's power to adopt legislative rules:

Ordinarily, when the FTC encounters a business practice it considers deceptive, it issues a complaint against the responsible company. If the recipient is not prepared to change its practices, the matter is set for a trial-type hearing at which the Commission bears the burden of showing that the respondent's practices have deceived, or are likely to deceive, a substantial number of purchasers. Counsel for the Commission customarily must introduce evidence sufficient to support the complaint's theory of deception. In the *Petroleum Refiners* context, this would mean that Commission counsel would attempt to show the wide range of octane levels among marketed gasolines, general consumer ignorance of the ratings of specific brands, the waste of purchasing more octane than one's car engine requires, and, probably, the tendency of consumers, in the absence of information, to purchase more octane than their cars require. On each of these issues the respondent would be entitled to present evidence and cross-examine witnesses. Follow-

an "important power by which the Commission can fairly and efficiently pursue its important statutory mission." H.R.Rep.No. 93–1606, *supra* at 31.[32] Through rulemaking, the Commission may allocate resources more efficiently, act with greater speed, and give specific notice to industries of the scope of section 5. *See National Petroleum Refiners Association v. FTC,* 157 U.S.App. D.C. 83, 101–102, 482 F.2d 672, 690–91 (D.C. Cir.1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).[33] More important, rulemaking allows an agency to gather information and views that might be irrelevant to the narrowly focused concerns of adjudication:

[U]tilizing rule-making procedures opens up the process of agency policy innovation to a broad range of criticisms, advice

ing the evidentiary hearing the Commission would make findings of fact and decide whether the facts found demonstrated a violation. If the Commission concluded that they did, its decision would be subject to limited court review. Probably the most important feature of this process, from the respondent's viewpoint, is the assurance of an opportunity to present his own evidence and cross-examine adverse witnesses on the central factual issues in the case.

What procedure may the Commission follow now that its authority to adopt the octane-posting rule has been upheld? The basic procedural steps remain essentially unchanged, but the issues to be litigated are narrowed significantly. If any gasoline distributors fail to comply with the rule, the Commission must initiate the complaint, hearing, decision, and court review process previously outlined against each one. However, assuming the Commission's rule is valid, it need only show that the respondent has failed to comply with the rule—not that his omission of octane ratings is deceptive under § 5. The Commission will have established the necessary factual predicate for its judgment—that such omission is deceptive—in the original rulemaking proceeding. The respondent may of course present evidence and cross-examine on the issue of whether the required postings were made, but he will not be allowed to relitigate the factual premises underlying the Commission's rule.

J. Mashaw & R. Merrill, *The American Public Law System* 247–48 (1975). *See United States v. Storer Broadcasting Co.,* 351 U.S. 192, 201–03, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

and data that is ordinarily less likely to be forthcoming in adjudication. Moreover, the availability of notice before promulgation and wide public participation in rule-making avoids the problem of singling out a single defendant among a group of competitors for initial imposition of a new and inevitably costly legal obligation.

*Id.* at 683.

In determining the type of rulemaking procedures to be employed by the Commission, Congress sought "to avoid rigid or cumbersome procedures that could involve undue costs and delay." H.R.Rep.No.93–

1606, *supra* at 33. To this end, Congress gave the Commission authority to limit rebuttal and cross-examination. In so acting, Congress heeded the advice of ACUS, which, when asked to comment upon the House proposal, warned that requiring "trial-type procedures . . . [in] rulemaking of general applicability [may] produce a virtual paralysis of the administrative process." [34]

Although Congress refused to subject section 18 proceedings to formal rulemaking requirements, it did order use of procedures not required in informal rulemaking under the APA.[35] Congress intended these addi-

**34.** Appellants' Supplemental Memorandum, Attachment 11, at 2. Then-Chairman Robert Anthony, in a letter to Congressman Staggers, explained:

> The Food and Drug Administration is required to use trial-type techniques for much of its general rulemaking pertaining to standards for food products. No proceeding subject to this requirement has been completed in less than two years; two have taken more than ten years; a hearing transcript of over 7,700 pages has been devoted exclusively to the question whether peanut butter should consist of 87½ percent or 90 percent peanuts. *Id.*

Many recent commentators have echoed ACUS's view that full use of formal rulemaking provisions unnecessarily hampers the administrative process. *See, e. g.,* 1 K. Davis, *supra* note 18, § 6:8; G. Robinson & E. Gellhorn, *The Administrative Process* 542 n. 47 (1974); Hamilton, *Rulemaking on a Record by the Food and Drug Administration,* 50 Tex.L.Rev. 1132, 1153–56 (1972).

**35.** The requirements imposed by § 18 that are not mandated by § 553 of the APA include the following:

(1) The Commission must publish a "notice of proposed rulemaking stating with particularity the reason for the proposed rule." 15 U.S.C. § 57a(b)(1). Section 553(b) requires issuance of a "[g]eneral notice of proposed rule making" with certain exceptions. 5 U.S.C. § 553(b).

(2) The Commission must allow public comment and must "make all such submissions publicly available." 15 U.S.C. § 57a(b)(2). Section 553 does not have an analogous publication requirement. 5 U.S.C. § 553(b).

(3) The Commission must conduct an informal hearing at which an interested person is entitled "to present his position orally or by documentary submissions (or both)." 15 U.S.C. § 57a(c)(1)(A). If the Commission determines disputed issues of material fact exist,

then such persons have such a right to rebuttal and cross-examination as is (i) appropriate and (ii) "required for a full and true disclosure with respect to such issues." 15 U.S.C. § 57a(c)(1)(B). The Commission is given the explicit, additional authority to "prescribe such rules and make such rulings . . . as may tend to avoid unnecessary costs or delay," including "reasonable time limits on each interested person's oral presentations." 15 U.S.C. § 57a(c)(2). Under appropriate conditions, the Commission may also limit the representation of a group of persons who "have the same or similar interests . . . ." 15 U.S.C. § 57a(c)(3)(A).

Section 553(c) merely requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

(4) The Commission must include in its statement of basis and purpose that accompanies a rule:

> (A) a statement as to the prevalence of the acts or practices treated by the rule; (B) a statement as to the manner and context in which such acts or practices are unfair or deceptive; and (C) a statement as to the economic effect of the rule, taking into account the effect on small business and consumers.

15 U.S.C. § 57a(d)(1). Section 553(c) requires an agency only to issue a statement of basis and purpose. 5 U.S.C. § 553(c).

(5) A reviewing court must set aside a Commission decision "not supported by substantial evidence in the rulemaking record . . . taken as a whole." 15 U.S.C. § 57a(e)(3)(A). The rulemaking record consists of the rule, the statement of basis and purpose, the transcript of the hearing, any written submissions, and "any other information which the Commission considers relevant to [the] rule." 15 U.S.C. § 57a(e)(1)(B). A reviewing court must also

tional procedures "to improve the quality of information available to the Commission," H.R.Rep.No. 93–1606, *supra* at 33, and to compel reexamination of the proposed rule in light of the arguments adduced during the comment period. Incorporation of this information into a rulemaking record also allows a reviewing court to exercise meaningful supervision over the Commission's decision.

### B

We never intended the *Cinderella* rule to apply to a rulemaking procedure such as the one under review. The *Cinderella* rule disqualifies a decisionmaker if " 'a disinterested observer may conclude that [he] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.' " 138 U.S.App.D.C. at 160, 425 F.2d at 591 (quoting *Gilligan, Will & Co. v. SEC*, 267 F.2d at 469). As we already have noted,[36] legislative facts adduced in rulemaking partake of agency expertise, prediction, and risk assessment. In *Cinderella*, the court was able to cleave fact from law in deciding whether Chairman Dixon had prejudged particular factual issues. In the rulemaking context, however, the factual component of the policy decision is not easily assessed in terms of an empirically verifiable condition. Rulemaking involves the kind of issues "where a month of experience will be worth a year of hearings."[37] Application of *Cinderella's* strict law-fact dichotomy would necessarily limit the ability of administrators to discuss policy questions.

The legitimate functions of a policymaker, unlike an adjudicator, demand interchange and discussion about important issues. We must not impose judicial roles upon administrators when they perform functions very different from those of judges. As Professor Glen O. Robinson, a former member of the Federal Communications Commission, has commented:

Although members of agencies such as the FCC certainly do perform significant judicial functions in deciding individual cases, they perform even more tasks of a legislative or an executive character. When the FCC, for example, promulgated regulations barring common ownership of local newspapers and broadcast stations, it performed a legislative task, pure and simple. In reaching the decision, the Commission was neither bound by, nor expected to conform to, the confining procedures or standards of a court. Why then should the decisionmakers be stamped from a judicial cast? Insofar as the agency is delegated broad legislative powers and responsibilities, would it not be at least as appropriate to measure agency members against standards used to evaluate legislators? Such standards would place agency members on a better standing with respect to judges and would create an entirely new frame of reference for assessing agency performance. The supremacy of carefully reasoned principle—the supposed ideal of judicial decision—necessarily would yield to the dictates of political compromise and expediency, which are the accepted hallmarks of legislative action. Correspondingly, the standard for evaluating the composition of the agencies would shift from an emphasis on professional training to an emphasis on representativeness.

Robinson, *The Federal Communications Commission: An Essay on Regulatory Watchdogs*, 64 Va.L.Rev. 169, 185–86 (1978) (footnotes omitted).[38]

The *Cinderella* view of a neutral and detached adjudicator is simply an inapposite

---

set aside a rule when the Commission's rulings on rebuttal and cross-examination have "precluded disclosure of disputed material facts . . . necessary for fair determination by the Commission of the rulemaking proceeding taken as a whole." 15 U.S.C. § 57a(e)(3). A court reviewing rulemaking conducted pursuant to § 553 will set aside an agency decision that is arbitrary or capricious or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

**36.** *See* pp. ——–—— of 201 U.S.App.D.C., pp. 1161–1163 of 627 F.2d *supra*.

**37.** *American Airlines, Inc. v. CAB*, 123 U.S. App.D.C. 310, 319, 359 F.2d 624, 633 (D.C.Cir. 1966) (en banc).

**38.** *See* 1 Senate Comm. on Gov't Operations, 95th Cong., 1st Sess., *Study on Federal Regulations* 156–61 (1978) (recommending that regulatory philosophy be a principal factor in selec-

role model for an administrator who must translate broad statutory commands into concrete social policies.[39] If an agency official is to be effective he must engage in debate and discussion about the policy matters before him. As this court has recognized before, "informal contacts between agencies and the public are the 'bread and butter' of the process of administration." *Home Box Office, Inc. v. FCC*, 185 U.S.App. D.C. 142, 190, 567 F.2d 9, 57 (D.C.Cir.) (per curiam), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).[40]

Our view is consistent with two Supreme Court opinions that detail prejudgment standards for administrators who speak out on public policy matters. In *Hortonville Joint School District No. 1 v. Hortonville Education Association*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976), the Court held that the due process clause did not bar a local school board, which was negotiating renewal of a collective-bargaining agreement with teachers, from dismissing teachers who were engaged in an illegal strike following failure of the contract negotia-

tion of administrators). As one commentator has observed in a slightly different context:

Agencies are created to maintain or to restructure certain areas of private activity in light of expressed statutory policies. Thus, unlike courts, agencies should be positive actors, not passive adjudicators.

. . . [A]n agency should not apologize for being predisposed to implementing the goals that Congress has set for it. To call such an attitude "bias" . . . misses this central point.

Pedersen, *The Decline of Separation of Functions in Regulatory Agencies*, 64 Va.L.Rev. 991, 994 (1978).

**39.** The APA provisions governing adjudication accordingly impose limitations on administrators not placed on rulemakers. Section 554(d) prohibits ex parte contacts between prosecutors and administrators within the same agency. 5 U.S.C. § 554(d). This separation-of-functions provision does not apply in either informal or formal rulemaking. *See Hercules, Inc. v. EPA*, 194 U.S.App.D.C. 172, 205–206, 598 F.2d 91, 124–25 (D.C.Cir.1978). The Attorney General's Manual on the Administrative Procedure Act 15 (1947) attributes this distinction to the difference between the roles of rulemakers and adjudicators:

Even in formal rule making proceedings subject to sections [556 and 557], the Act leaves the hearing officer entirely free to consult with any other member of the agency's staff. In fact, the intermediate decision may be made by the agency itself or by a responsible officer other than the hearing officer. This reflects the fact that the purpose of the rule making proceeding is to determine policy. Policy is not made in Federal agencies by individual hearing examiners; rather it is formulated by the agency heads relying heavily upon the expert staffs which have been hired for that purpose. And so the Act recognizes that in rule making the intermediate decisions will be more useful to the parties in advising them of the real issues in the case if such decisions reflect the views of the agency

heads or of their responsible officers who assist them in determining policy. In sharp contrast is the procedure required in cases of adjudication subject to section [554(d)]. There the hearing officer who presides at the hearing and observes the witnesses must personally prepare the initial or recommended decision required by section [557]. Also, in such adjudicatory cases, the agency officers who performed investigative or prosecuting functions in that or a factually related case may not participate in the making of decisions. These requirements reflect the characteristics of adjudication . . . .

*See generally* Pedersen, *supra* note 38, at 996–1001.

**40.** In *Home Box Office*, a panel of this court ruled that "communications which are received [by an agency] prior to issuance of a formal notice of rulemaking do not, in general, have to be put in a public file," although discussions following publication of a notice of rulemaking must be so filed. 185 U.S.App.D.C. at 190, 567 F.2d at 57. Later, another panel questioned the wisdom of even this restriction on ex parte contacts in rulemaking. *See Action for Children's Television v. FCC*, 183 U.S.App.D.C. 437, 564 F.2d 458 (D.C.Cir.1977). Two other cases have faced similar situations and reached differing conclusions. *Compare United States Lines, Inc. v. FMC*, 189 U.S.App.D.C. 361, 378–385, 584 F.2d 519, 536–43 (D.C.Cir.1978), *with Hercules, Inc. v. EPA*, 194 U.S.App.D.C. 172, 204–209, 598 F.2d 91, 123–28 (D.C.Cir.1978). We need not reach the question of whether *Home Box Office* is indeed the law of this circuit, for in this case, Chairman Pertschuk's remarks preceded the Commission's notice of proposed rulemaking, *see* pp. —— —— of 201 U.S.App.D.C., p. 1155 of 627 F.2d *supra*, p. —— of 201 U.S.App.D.C., p. 1173 of 627 F.2d *infra*, and, as just noted, *Home Box Office* by its own terms does not apply to this situation.

tions.[41] The Court stated that a decision-maker need not be disqualified "simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Id.* at 493, 96 S.Ct. at 2314 (quoting *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)).

The Court's decision in *FTC v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), is likewise instructive. There, a trade association urged that the Commission be disqualified from deciding whether a trade practice violated the antitrust laws because its members previously had endorsed the view before both the Congress and the President that the practice was the equivalent of illegal price-fixing. The Court rejected the trade association's claim because, *inter alia*, the earlier statements "did not necessarily mean that the minds of [Commission] members were irrevocably closed." *Id.* at 701, 68 S.Ct. at 803.[42]

A similar standard is applicable to section 18 rule-making. Section 18 outlines a process by which the Commission must form a preliminary view on a proposed rule, must hear comment from concerned parties, and in some cases, must hold trial-type proceedings before deciding whether to promulgate a rule. There is no doubt that the purpose of section 18 would be frustrated if a Commission member had reached an irrevocable decision on whether a rule should be issued prior to the Commission's final action. At the same time, the Commission could not exercise its broad policymaking power under section 18 if administrators were unable to discuss the wisdom of various regulatory positions. That discussion necessarily involves the broad, general characterizations of reality that we label legislative fact.

Accordingly, a Commissioner should be disqualified only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding. The "clear and convincing" test is necessary to rebut the presumption of administrative regularity. *See, e. g., Withrow v. Larkin*, 421 U.S. 35, 55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Hercules, Inc. v. EPA*, 194 U.S.App.D.C. 172, 204, 598 F.2d 91, 123 (D.C.Cir.1978). The "unalterably closed mind" test is necessary to permit rulemakers to carry out their proper policy-based functions while disqualifying those unable to consider meaningfully a section 18 hearing.[43]

## V

We view the statements offered as grounds for disqualification as a whole to discern whether they evidence a clear and convincing showing that Chairman Pertschuk has an unalterably closed mind on

---

41. The Court gave three reasons why the school board could not be disqualified from deciding whether teachers participating in a strike prohibited by law should be discharged: (1) the school board did not have a financial or personal stake in the decision, *see, e. g., Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); (2) in the absence of a showing that a decisionmaker is incapable of judging a particular controversy fairly, he will not be disqualified because of "[m]ere familiarity with the facts of a case" or his having taken a position on a policy issue; and (3) the legitimate government interest in preserving the school board as the creator of local policy would be thwarted if familiarity with the factual circumstances of the contract negotiations forced disqualification. 426 U.S. at 491–96, 96 S.Ct. at 2314.

42. As a separate ground, the Court noted that disqualification of the entire Commission would "immunize" the trade association from regulation under the Federal Trade Commission Act. 333 U.S. at 701–02, 68 S.Ct. 793.

43. *See generally Carolina Environmental Study Group v. United States*, 166 U.S.App.D.C. 416, 421, 510 F.2d 796, 801 (D.C.Cir.1975) (due process challenge to Atomic Energy Commission's order allowing construction of nuclear power plants on basis of agency's "promotional bias" favoring use of atomic energy rejected because "[a]gencies are required to consider in good faith, and to objectively evaluate, arguments presented to them; agency officials, however, need not be subjectively impartial").

matters critical to the children's television proceeding. The most important evidence submitted by the appellees is a speech Chairman Pertschuk delivered in November 1977 to the ACT Research Conference. The other materials generally derive from this speech.[44]

The speech focused on whether section 5 of the FTC Act, which prohibits "unfair or deceptive acts or practices," may be applicable to children's advertising. Pertschuk first asserted that children have only a minimal understanding of the nature of television commercials and are unable to distinguish between advertising and other forms of information. He quoted a finding by the Federal Communications Commission that "many children do not have the sophistication or experience needed to understand that advertising is not just another form of informational programming."[45]

Pertschuk then set out relevant legal principles. He quoted a Supreme Court opinion that gave the Commission wide-ranging discretion to declare a trade practice unfair.[46] He noted the legal recognition of children's lack of evaluative capacity and the concomitant protection for children built into commercial and tort law. Among the doctrines he mentioned were the unenforceability of a contract signed by a child, the prohibition against selling children otherwise legal goods, such as liquor and cigarettes, the bar against children leaving school or driving a car, and the "attractive nuisance" rule of liability, which holds persons who maintain conditions on their property that are likely to entice small children responsible for harm to those children.

Pertschuk continued by discussing the effects of advertising on children. He explained that "children are not adults in miniature. Instead, they bring to advertising a special perspective and sensibility—a credulousness that comes from inexperience—which advertisers exploit."[47] He stated that sugared foods may be harmful to children and that children may not understand the health problems, like tooth decay, that can result from excessive consumption of sugared products: "Children lack the judgment and experience to see that something that looks good to them in the short run can hurt them in the long run."[48] He suggested that children's advertising might be deceptive because it highlights the general desirability of sugared foods without providing material information on the health risks.

Finally, Pertschuk noted that any action taken against children's advertising would bring opposition from affected economic interests. He said that "[i]f the Commission is to reach sound and reasoned judgments, it must also hear from the parents, the teachers, the pediatricians, the dentists, those health and education specialists on whom we rely for the advocacy of our children's best interest."[49] Pertschuk concluded by stating: "[W]e must be rigorous and open-minded in our analysis of both law and fact."[50]

Chairman Pertschuk's remarks, considered as a whole, represent discussion, and perhaps advocacy, of the legal theory that might support exercise of the Commission's jurisdiction over children's advertising. The mere discussion of policy or advocacy on a legal question, however, is not sufficient to disqualify an administrator.[51]

---

44. See note 56 infra.

45. A. at 39.

46. FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972).

47. A. at 44.

48. Id. at 42.

49. Id. at 46.

50. Id.

51. Even judges are free to decide cases involving policy questions on which they previously have expressed a view. Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), is particularly illustrative. In that case, the petitioners attacked on first amendment grounds the constitutionality of the Army's collection of information about public activities thought to have some potential for civil disorder. The Supreme Court held, by a 5–4 vote, that the jurisdiction of a federal court could not be invoked by "a complainant who alleges that the exercise of his First Amendment rights is being

To present legal and policy arguments, Pertschuk not unnaturally employed the factual assumptions that underlie the rationale for Commission action. The simple fact that the Chairman explored issues based on legal and factual assumptions, however, did not necessarily bind him to them forever. Rather, he remained free, both in theory and in reality, to change his mind upon consideration of the presentations made by those who would be affected.

In outlining his legal theory of "unfairness," Pertschuk suggested that children might be harmed by overconsumption of sugared products and that they might not be able to comprehend the purpose of advertising. Insofar as these conclusions are ones of fact, they are certainly of legislative

fact. Neither conclusion bears on the particular activities of any specific advertiser or food manufacturer or makes reference to the health or comprehension of any particular child. These conclusions are broad and general, far removed from the narrow, detailed facts that were at the heart of the *Cinderella* case.[52]

Together, the two conclusions tend to show that children may be "injured" by the advertising of highly sugared products. The Commission has stated that it will consider three factors in deciding whether a trade practice is unfair: whether the action is (1) offensive to public policy as established by some legal doctrine, (2) immoral, and (3) substantially injurious to consumers.[53] Chairman Pertschuk scarcely could

chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose." *Id.* at 10, 92 S.Ct. at 2324.

Following the Court's decision, the petitioners asked Justice Rehnquist, who was a member of the majority, to recuse himself, nunc pro tunc, on the basis of earlier statements he had made on the constitutionality of governmental surveillance. Justice Rehnquist, before his nomination and confirmation as an Associate Justice of the Supreme Court, had testified before a Senate subcommittee as a representative of the Justice Department. The hearings were called to consider, *inter alia*, the authority of the Executive Branch to gather information. In the course of his testimony, Justice Rehnquist concluded that domestic surveillance was constitutional.

In a separate memorandum, Justice Rehnquist dismissed the contention that he should disqualify himself because he had expressed views contrary to the legal position of the petitioner in *Laird v. Tatum*. He surveyed the actions of Justices in this century and concluded that "none of the former Justices of this Court since [enactment of the judicial disqualification statute] have followed a practice of disqualifying themselves in cases involving points of law with respect to which they had expressed an opinion or formulated policy prior to ascending to the bench." *Laird v. Tatum*, 409 U.S. 824, 831, 93 S.Ct. 7, 11, 34 L.Ed.2d 50 (1972) (memorandum of Rehnquist, J.). Indeed, Justice Rehnquist suggested that

[i]t would not be merely unusual, but extraordinary, if [Justices] had not at least given opinions as to constitutional issues in their previous legal careers. Proof that a Justice's mind at the time he joined the Court was a

complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias.

*Id.* at 835, 93 S.Ct. at 13–14.

Justice Rehnquist's opinion is in full accord with the general principle that a federal judge will not be disqualified pursuant to 28 U.S.C. § 144 or § 455 (1976) because of prior expression of views on a legal question. *See, e. g., Antonello v. Wunsch*, 500 F.2d 1260, 1262 (10th Cir. 1974); *Goodpasture v. TVA*, 434 F.2d 760, 765 (6th Cir. 1970); *Knoll v. Socony Mobil Oil Co.*, 369 F.2d 425, 430 (10th Cir. 1966); *Knapp v. Kinsey*, 232 F.2d 458, 466 (6th Cir.), *cert. denied*, 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956); *Loew's, Inc. v. Cole*, 185 F.2d 641, 646 (9th Cir. 1950).

A contrary result in this case would create an anomaly between administrative policymakers, who would be barred from discussion of legislative fact prior to promulgation of a notice of proposed rulemaking, and judges, who are free to discuss policy questions and to take judicial notice of legislative fact. *See* note 24 *supra*. Due process, which recognizes a distinction between judges and rulemakers, allows rulemakers greater freedom. *See* pp. —— ——, —— —— of 201 U.S.App.D.C., pp. 1162–1163, 1165–1166 of 627 F.2d *supra*.

**52.** In *Cinderella*, Chairman Dixon had referred specifically to the adjudication pending before the Commission and had prejudged precise factual issues. *See* pp. —— —— of 201 U.S.App. D.C., pp. 1158–1159 of 627 F.2d *supra*.

**53.** Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed.Reg. 8355 (1964), *quoted in FTC v. Sperry & Hutch-*

have discussed the "unfairness" doctrine without assuming for the purpose of discussion that some injury might result from the trade practice in question.

■ We also note that Chairman Pertschuk made the challenged comments before the Commission adopted its notice of proposed rulemaking. This court has never suggested that the interchange between rulemaker and the public should be limited prior to the initiation of agency action.[54] The period before the Commission first decides to take action on a perceived problem is, in fact, the best time for a rulemaker to engage in dialogue with concerned citizens. Discussion would be futile, of course, if the administrator could not test his own views on different audiences. Moreover, as we stated earlier,[55] an expression of opinion prior to the issuance of a proposed rulemaking does not, without more, show that an agency member cannot maintain an open mind during the hearing stage of the proceeding.

Indeed, section 18 in effect requires the Commission to formulate tentative judgments on suggested rules. Before the Commission initiates rulemaking proceedings, it must "publish a notice of proposed rulemaking stating with particularity the reason for the proposed rule prior to the comment stage of the proceeding." 15 U.S.C. § 57a(b). The Conference Committee on the Magnuson-Moss Act referred to the period following this notice as one during which affected parties could "challenge the factual assumptions on which the Commission is proceeding and to show in what respect these assumptions are erroneous." H.R.Rep.No. 93–1606, *supra* at 33. Congress intended for the Commission to develop proposals that subsequently would be published and discussed openly. To perform this task intelligently necessarily involves making tentative conclusions of fact, even if they later are open to public challenge.

In sum, we hold that the materials adduced by the appellees are insufficient to rebut the strong presumption of administrative regularity.[56] The materials, as a

---

inson Co., 405 U.S. 233, 245 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). *See* Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 Harv.L.Rev. 661, 681–87 (1977).

**54.** *See* note 40 *supra.*

**55.** *See* pp. ——–—— of 201 U.S.App.D.C., pp. 1171–1172 of 627 F.2d *supra.*

**56.** A review of other materials relied upon by the appellees supports our conclusion. As a group, they demonstrate only that Chairman Pertschuk articulated the legal theory put forth in the ACT speech:

(1) A Commission press release, dated July 20, 1977, stated that Chairman Pertschuk had met with ACT representatives and had suggested that children's advertising might be unfair without being deceptive because children "are a vulnerable population that may require special protection from advertisers." A. at 33.

(2) Chairman Pertschuk was quoted, in a newspaper column, as stating that "a 4 to 5-year-old child . . . may not understand what advertising is about." *Id.* at 47.

(3) In an article published in *Newsweek* magazine, Chairman Pertschuk was quoted as saying that he was committed to taking action on the problem of commercialization of children and that "[a]dvertisers seize on the child's trust and exploit it as a weakness for their gain." *Id.* at 48.

(4) In an interview published in *TV Guide*, Chairman Pertschuk stated that children are not sophisticated consumers, noted that the Commission might have the power to limit certain children's advertising, and predicted that "[a]s soon as the Commission proposes action" it will be involved in a long fight with advertisers. *Id.* at 50.

(5) In an article in the *Wall Street Journal*, two passages from Chairman Pertschuk's ACT speech were quoted. *Id.* at 49.

(6) During an interview televised on the "Today Show," Chairman Pertschuk engaged in the following colloquy with a viewer and interviewer Bob Abernathy:

SUSAN LOVETT: Mr. Pertschuk, I'd like to know what's being done about advertising on TV for children and all the garbage that's advertised for the kiddies.

PERTSCHUK: Well, I'm glad you asked the question. It's an area of prime concern to me and to the Commission itself. There's a very basic question in our society, and that is the question to which—the extent to which children are to be treated as commercial objects. One advertiser in New York described advertising directed to children as guided missiles, turning the children into guided missiles through the heart of the parent into its pocketbook.

whole, merely demonstrate that Pertschuk discussed a legal theory by which the Commission could adopt a rule, if circumstances warranted. The statements do not demonstrate that Chairman Pertschuk is unwilling or unable to consider rationally argument that a final rule is unnecessary because children are either unharmed by sugared products or are able to understand advertising. The appellees have failed to make a clear and convincing showing that Chairman Pertschuk has an unalterably closed mind on matters critical to the children's television proceeding.

## VI

The appellees have a right to a fair and open proceeding; that right includes access to an impartial decisionmaker. Impartial, however, does not mean uninformed, unthinking, or inarticulate. The requirements of due process clearly recognize the necessity for rulemakers to formulate policy in a manner similar to legislative action. The standard enunciated today will protect the purposes of a section 18 proceeding, and, in so doing, will guarantee the appellees a fair hearing.

We would eviscerate the proper evolution of policymaking were we to disqualify every administrator who has opinions on the correct course of his agency's future action. Administrators, and even judges, may hold

policy views on questions of law prior to participating in a proceeding. The factual basis for a rulemaking is so closely intertwined with policy judgments that we would obliterate rulemaking were we to equate a statement on an issue of legislative fact with unconstitutional prejudgment. The importance and legitimacy of rulemaking procedures are too well established to deny administrators such a fundamental tool.

Finally, we eschew formulation of a disqualification standard that impinges upon the political process. An administrator's presence within an agency reflects the political judgment of the President and Senate. As Judge Prettyman of this court aptly noted, a "Commission's view of what is best in the public interest may change from time to time. Commissions themselves change, underlying philosophies differ, and experience often dictates changes." *Pinellas Broadcasting Co. v. FCC*, 97 U.S. App.D.C. 236, 238, 230 F.2d 204, 206 (D.C. Cir.), *cert. denied*, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956). We are concerned that implementation of the *Cinderella* standard in the rulemaking context would plunge courts into the midst of political battles concerning the proper formulation of administrative policy. We serve as guarantors of statutory and constitutional

ABERNATHY: Is it your personal opinion that no television advertising, for instance, should be directed at children?

PERTSCHUK: I have some serious doubt as to whether any television advertising *should be directed at a three or four or five year old*, a preschooler. They're not competent to understand the nature of the message. We've never treated children as commercial objects in our society. And of course, print advertising only reaches those who can read. But television advertising in the home, directed to children, is a new phenomenon in our society, and I think a troublesome one.

ABERNATHY: Would you like to see the FTC ban it altogether?

PERTSCHUK: Not necessarily. But we've not excluded the possibility of bans on certain advertising of certain products to children.

The Trade Commission has not, as a body—you know, there are four other commissioners who must address this issue for

the Commission to act—has not, as a body, yet approached the question of the remedy for the evils we see in children's advertising. We'll do that next month.

*Id.* at 31.

(7) In three letters dated the day after delivery of the ACT speech, Chairman Pertschuk said that the speech set forth the legal underpinnings for Commission action against children's advertising. *Id.* at 71–73.

(8) In a letter to Food and Drug Commissioner Donald Kennedy, Chairman Pertschuk outlined the logical steps underlying the legal theory that children's advertising is unfair. In particular, he noted that the Commission would have to be able to demonstrate "that there is a substantial health controversy regarding the health consequences of sugar."

*Id.* at 95.

None of these materials significantly adds to the legal theory presented in the ACT speech, nor do they raise issues of legislative fact not addressed therein.

rights, but not as arbiters of the political process. Accordingly, we will not order the disqualification of a rulemaker absent the most compelling proof that he is unable to carry out his duties in a constitutionally permissible manner.

*Reversed.*

LEVENTHAL, Circuit Judge, concurring:

I concur in Judge Tamm's opinion for the court. It makes important contributions to our understanding of the issues. My comments on the merits are to add the perspective that a concurring opinion sometimes permits. On the jurisdictional issues, I have additional views which in the end I do not present for this case but set forth to govern future proceedings.

### A.

The ultimate test announced by Judge Tamm as to the merits is that disqualification from a rulemaking proceeding results "only when there has been a clear and convincing showing that [the agency member] has an unalterably closed mind on matters critical to the disposition of the [proceeding]." The test reflects a Supreme Court ruling as to administrative agencies.[1]

It is not far removed from the test used in considering challenges to those considered for the duty as jurors quintessentially engaged in specific fact-finding.[2] It is similar to a standard articulated as to recusal of judges.[3]

The application of this test to agencies must take into account important differences in function and functioning between the agencies and court systems. In fulfilling the functions of applying or considering the validity of a statute, or a government program, the judge endeavors to put aside personal views as to the desirability of the law or program, and he is not disqualified because he personally deems the program laudable[4] or objectionable.[5] In the case of agency rulemaking, however, the decision-making officials are appointed precisely to implement statutory programs, and with the expectation that they have a personal disposition to enforce them vigilantly and effectively. They work with a combination rather than a separation of functions, in legislative modes, and take action on the basis of information coming from many sources, even though that provides a mind-set before a proceeding is begun, subject to reconsideration in the light of the proceeding.

Judge Tamm's opinion for the court ventilates important distinctions between rulemaking and adjudication and their consequences in terms of standards of disqualification, and the differences between adjudicative facts pertinent to specific parties and generalized legislative facts, including predictions and underlying views on policy. As Judge Tamm notes, the differences generally identify differences in procedure required for their determination.[6] The difference in nature of issues persists, as Judge Tamm points out, even though some of the tasks of rulemaking are carried out with adaptations of adjudicative forms,

1. *FTC v. Cement Institute*, 333 U.S. 683, 701, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (Commission's expression of views).

2. The test is whether "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Dobbert v. Florida*, 432 U.S. 282, 302, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977); *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *United States v. Haldeman*, 181 U.S. App.D.C. 254, 283, 559 F.2d 31, 60 (1977) (en banc).

3. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966) ("manifesting a closed mind on the merits," as applied to views expressed after hearing some evidence).

4. *Eisler v. United States*, 83 U.S.App.D.C. 315, 320, 170 F.2d 273, 278 (D.C.Cir.1948).

5. *Idaho v. Freeman*, 478 F.Supp. 33 (D. Idaho, 1979).

6. *American Airlines, Inc. v. CAB*, 123 U.S.App. D.C. 310, 359 F.2d 624 (D.C.Cir.1966) (en banc).

whether this additional procedure is adopted voluntarily by the agency, as has sometimes been the case, or is required by court or legislation.

The provisions of the Moss-Magnuson Act have been widely recognized as in effect incorporating into statutory law the approach identified in a number of decisions, primarily decisions of this court. Those decisions set forth the proposition that although rulemaking generally proceeds merely upon the basis of written comment on a proposal, some specific issues are of such a nature that meaningful opportunity for comment requires additional scope for presentation, perhaps by oral submission in the form of a legislative hearing, perhaps by cross-examination in matters involving a specific factual issue where meaningful comment requires a predicate of probing the basis for the contrary views. The train of opinions in this circuit runs from *American Airlines*, through *Holm v. Hardin,* to *International Harvester*, which had the highest visibility and became the focal point of discussion.[7]

It is fair to say that in all of our opinions the assumption was that particular issues might require additional procedures, if they were contested, but that the basic framework of the rulemaking proceeding as one primarily dependent on general policy formulation was unaffected by the particular procedures. Of course, there remains a requirement of fairness for those with authority to act by rulemaking but the standards are not identical with those pertinent for judicial-type decisionmaking in adjudicatory actions.

Consider, for example, the assertions of an agency head that he discerns abuses that may require corrective regulation. One can hypothesize beginning an adjudicatory proceeding with an open mind, indeed a blank mind, a tabula rasa devoid of any previous knowledge of the matter. In sharp contrast, one cannot even conceive of an agency conducting a rulemaking proceeding unless it had delved into the subject sufficiently to become concerned that there was an evil or abuse that required regulatory response. It would be the height of absurdity, even a kind of abuse of administrative process, for an agency to embroil interested parties in a rulemaking proceeding, without some initial concern that there was an abuse that needed remedying, a concern that would be set forth in the accompanying statement of the purpose of the proposed rule.

In its administrative setting an agency's effort is not limited to one type of activity. Investigation and policy-making are integral to the total function just as much as decisionmaking. It is appropriate and indeed mandatory for agency heads and staff to maintain contacts with industry and consumer groups, trade associations and press, congressmen of various persuasions, and to present views in interviews, speeches, meetings, conventions, and testimony. The agency gathers information and perceptions in a myriad of ways and must use it for a myriad of purposes.[8] With capacity and

---

7. *American Airlines, Inc. v. CAB*, 123 U.S.App. D.C. 310, 359 F.2d 624 (D.C.Cir.1966) (en banc); *Walter Holm & Co. v. Hardin*, 145 U.S. App.D.C. 347, 449 F.2d 1009 (D.C.Cir.1971) (Judges McGowan, Leventhal and Van Pelt); *International Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615 (D.C.Cir. 1973) (Judges Bazelon, Tamm and Leventhal).

8. *Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1375–1376 (9th Cir. 1978):

Information gathered by the Commission under its broad investigatory powers can be used for a variety of purposes, including promulgation of new rules, reporting to Congress, disseminating economic knowledge to the public, or, as here, to prepare an economic survey or report to enable the Commission to better administer the statutes over which it has jurisdiction. In addition, factual material compiled by the agency may call its attention to situations which warrant an adjudicative enforcement proceeding. . . . Indeed, one of the purposes of industry investigations is to provide the agency with increased expertise in administering the law by exposing it to the factual background of relevant industries against which to judge individual mergers and acquisitions.

Likewise, the fact that some of the Commissioners' conclusions expressed in the Enforcement Policy were mirrored in the complaint does not prove prejudgment. The Enforcement Policy was openly cautious to phrase its conclusions tentatively.

willingness to reconsider there is no basis for disqualification.

The tests of disqualification cannot be applied identically for judges and agency heads, for reasons already identified. Yet even judges are not disqualified merely because they have previously announced their positions on legal issues,[9] even as to announcements outside the course of written decisions.[10] Judicial disqualification cannot be based on general frame of reference, attitudes or assumptions as to the processes of society.[11] And even a judge's public comment giving a general impression of a state of facts does not present a rigidity against refinement and reflection that disqualifies him from sitting in judgment on a particular fact issue.[12]

#### B.

I now turn to what I consider a jurisdictional problem. In part it is addressed in part II of Judge Tamm's opinion, dealing with the doctrine of exhaustion of administrative remedies. I concur in many of Judge Tamm's observations, and the court's result. But my analysis is somewhat different.

The jurisdictional problems that concern me are first, whether, and under what circumstances, a Federal court has jurisdiction of an action to halt ongoing proceedings before an "agency" of the United States on the ground that they reflect impermissible bias or prejudice, and second, whether this can ever be done by a district court that has no jurisdiction to review the agency's final actions.

The doctrine of exhaustion of administrative remedies, which Judge Tamm discusses, is a judge-made prudential doctrine—a "rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). The Court gave little weight to the claim "that the mere holding of the prescribed administrative hearing would result in irreparable damage." 303 U.S. at 51, 58 S.Ct. at 464.

The jurisdictional difficulty arises out of the requirement of finality, a related doctrine which also comes into play in this case, and which overlaps the requirement of exhaustion of administrative remedies but is analytically distinct. One requirement may be applicable even when the other is not.

**9.** *FTC v. Cement Institute*, 333 U.S. 683, 701, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (Court used judicial analogy in the course of holding that Commission's expression of opinion on legality of a particular trade practice did not disqualify it from passing upon the lawfulness of the practice in an adjudicatory proceeding).

**10.** *Laird v. Tatum*, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972).

**11.** "The great tides and currents which engulf the rest of men do not turn aside in their course, and pass the judges by." B. N. Cardozo, The Nature of the Judicial Process 167–68 (1921). "[A] judge is not prevented from sitting because he comes into every case with a background of general personal experiences and beliefs." *In re Union Leader Corp.*, 292 F.2d 381, 388 (1st Cir. 1961). *See In re J. P. Linahan, Inc.*, 138 F.2d 650 (2d Cir. 1943), for Judge Frank's wide-ranging discussion, distinguishing between the need for disinterestedness in courts, as essential to democracy, and the presence of preconceptions and attitudes which are inevitable. The opinion urges self-scouting as to uniquely personal prejudices. It concludes that a referee is not disqualified from conducting a trial because he earlier came to a judgment that was reversed.

*See also Price v. Johnston*, 125 F.2d 806, 811 (9th Cir.), *cert. denied*, 316 U.S. 677, 62 S.Ct. 1106, 86 L.Ed. 1750 (1942), rejecting disqualification under 28 U.S.C. § 25, when the allegations "do not indicate a 'personal' prejudice or bias against the accused, but charge an impersonal prejudice, and go to the judge's background and associations rather than his appraisal of the defendant personally."

**12.** *United States v. Haldeman*, 181 U.S.App. D.C. 254, 358, 559 F.2d 31, 135ff. (D.C.Cir. 1976) (Judge Sirica's statement in a television interview, at the time of the 1974 Judicial Conference, that defendants "can get just as fair a trial in the District of Columbia as any federal court," did not reflect "inability or indisposition on the judge's part to objectively weigh and act upon a request to relocate the place of trial should it develop that an unbiased jury could not be assembled in the District of Columbia."

The Administrative Procedure Act provides, § 10(c), now 5 U.S.C. § 704: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." Statutes with special provisions for judicial review reflect the the same basic approach, of limiting review to final actions, and that is the case for the Moss-Magnuson Act's provision for judicial review (in the court of appeals) of FTC rulemaking.[13]

Section 10(c) of the APA is a generalized provision for judicial review by the district court where no other form of judicial review is prescribed by Congress. But it requires more than exhaustion of administrative remedies, it also requires a final agency action. *Association of National Advertisers, Inc. v. FTC*, 565 F.2d 237 (2nd Cir. 1977). It is elementary that the mere conduct of proceedings on a proposal of a rule, which may never be adopted or enforced, is not final action, and a court will not enjoin a rulemaking proceeding on a claim that the agency had no statutory or constitutional authority to promulgate the proposed rule. *Bristol-Myers Co. v. FTC*, 138 U.S. App.D.C. 22, 27, 424 F.2d 935, 940, *cert. denied*, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970).

If a proceeding should eventuate in a rule that a party opposes, the party may challenge the final action adopting the rule on the ground that the rule is defective for reasons of disqualification of a member. Accordingly, this is not a case of agency action (other than final action) "for which there is no other adequate remedy in a

court." Only in rare instances is a non-final agency action reviewed in the teeth of a general denial of jurisdiction. In *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) the Court was willing to bypass a general jurisdictional barrier when an agency clearly violated an express statutory prohibition. But the *Leedom* exception "is a narrow one."[14] It is reserved for the kind of clear case that identified the original doctrine of mandamus.

A court must disclaim jurisdiction notwithstanding the claim that action already taken realistically means that the ongoing proceeding will be waste motion and will have to be done over again. This is "part of the price we pay for the advantages of an administrative process" and preferable to having the process "clogged if there were interlocutory appeals to the courts." *Thermal Ecology Must Be Preserved v. Atomic Energy Comm.*, 139 U.S.App.D.C. 366, 368, 433 F.2d 524, 526 (1970). That opinion noted the possibility of an exception "in extreme instances where the action is held to constitute an effective deprivation of appellant's rights." *Id.* See also *Sterling Drug, Inc. v. FTC*, 146 U.S.App.D.C. 237, 250, 450 F.2d 698, 711 (1971).

Given these strong walls of jurisdictional barriers, and narrow gates of entrance, it is time to turn to the situation of a claim of prejudice or bias alleged to infect an agency proceeding at its core.

When a claim of bias is filed against a trial judge, his refusal to recuse himself is not appealable, there being no final order. However, there has been some tendency of the appellate courts to accept jurisdiction of the claim, notwithstanding their general

---

**13.** *See* 15 U.S.C. § 57a(e) providing that an interested person may file a petition "for judicial review" of a rule, not later than 60 days after a rule is promulgated by the Federal Trade Commission. Section 57a(e)(5)(B) provides:

The United States Court of Appeals shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of a rule prescribed under subsection (a)(1)(B) of this section, if any district court of the United States would have

jurisdiction of such action but for this subparagraph.

**14.** *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964) (no jurisdiction to enjoin a representation election; In *Switchmen's Union v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), the Court held Congress precluded review of a representation decision of the National Mediation Board.

confinement to review of final orders, of district courts, by reference to consider the matter on application for a writ of mandamus, at least in unusual cases, with jurisdiction predicated on the All-Writs Act, 28 U.S.C. § 1651.[15] That jurisdiction is not routinely invoked, and rulings are generally phrased in terms of "exceptional circumstances."[16] Mandamus was denied in *Mitchell v. Sirica*, 163 U.S.App.D.C. 373, 502 F.2d 375, *cert. denied*, 418 U.S. 955, 94 S.Ct. 3232, 41 L.Ed.2d 1177 (1974), notwithstanding the view of the dissent that the case was one of the "really extraordinary cases" that warrant mandamus, and that mandamus was appropriate under the All-Writs Act in cases "which are subject to our eventual appellate jurisdiction." (163 U.S.App. D.C. at 385, 502 F.2d at 387).

Even assuming *arguendo* that the case is one which this court would consider at an interlocutory stage as to a request for disqualification of a judge, it by no means follows that a court has jurisdiction to intervene in an ongoing administrative process. The courts have a limited supervisory province as to agencies,[17] but it is not as direct as the supervision of appellate courts over trial courts, and there are distinct limitations on available judicial remedies. *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Fund*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *FCC v. Pottsville Broadcasting & Co.*, 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed.2d 656 (1940); *Greater Boston TV Corp. v. FCC (II)*, 149 U.S.App.D.C. 322, 335, 463 F.2d 268, 281 (1971).

If there is to be an analogy to an expansion of mandamus of district judges, based on the existence of the appellate court's prospective jurisdiction, the jurisdiction would not lie in the district court, but in the court of appeals, which is where Congress had lodged general jurisdiction to review FTC orders and rules, 15 U.S.C. § 57a. To the extent that the All Writs Act has been used in connection with FTC matters, it is the court of appeals that has been found to have the power to grant relief. *FTC v. Dean Foods Co.*, 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966). On this thesis I posit a total lack of jurisdiction in the district court to consider the merits of plaintiff's case in any way or to any extent. Thus, even if this case fell within an exception to the finality requirement, jurisdiction to consider the interlocutory action would lie in this court and not the district court. But I recognize that this thesis has not previously been identified by the court and was not perceived in the 1962 *Amos Treat* decision, to be discussed below. *Amos Treat* issued prior to the Supreme Court's *Dean Foods* decision and is subject to reconsideration on this point.[18] But since this point is novel, and was not argued, I agree that it should not be given effect retrospectively.

Reverting to issues of bias or prejudice, this court has basically exercised its supervision in the context of review of *final* orders, *Cinderella Career & Finishing Schools, Inc. v. FTC*, 138 U.S.App.D.C. 152, 425 F.2d 583 (1970); *Texaco, Inc. v. FTC*, 118 U.S.App.D.C. 366, 336 F.2d 754 (1964), vacated and remanded on other grounds, 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714 (1965).

To the extent that there is any judicial jurisdiction to halt an ongoing agency proceeding—or what is the equivalent, to enter a declaratory judgment that it cannot result in a valid final action—that jurisdiction, whether exercised by this court or (let it be assumed) by a district court, is available only in a limited class of cases, not including the case at bar. There is always

---

15. C. Wright & A. Miller, Federal Practice and Procedure: Jurisdiction § 3553 at 387 (1975); 9 Moore's Federal Practice ¶ 110.13[10] at 187–188 (2d ed. 1975), cited in Judge Tamm's opinion at note 10.

16. *Action Realty Co. v. Will*, 427 F.2d 843 (7th Cir. 1970); *Green v. Murphy*, 259 F.2d 591 (3d Cir. 1958).

17. *Greater Boston TV Corp. v. FCC (I)*, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970).

18. The 1972 decision in *Fitzgerald* is not pertinent because the "final" agency order in that case would have been reviewable in the district court.

some problem of analysis when a court's determination of whether it has jurisdiction requires it to take a "peek at the merits." [19] But I think the doctrine can be etched fairly clearly.

The precedent primarily relied on by plaintiffs is *Amos Treat & Co. v. SEC,* 113 U.S.App.D.C. 100, 306 F.2d 260 (1962). The court enjoined an adjudicatory proceeding because one of the commissioners who had participated in certain rulings had previously, as a member of the staff, participated in the investigation. That decision was a ruling of a *structural* incapacity, which was necessary for a "fair trial" (113 U.S.App. D.C. at 103, 306 F.2d at 263). The next year another panel, Judges Bazelon, Bastian and Burger, described it as an "exceptional" case, *SEC v. R. A. Holman & Co.,* 116 U.S.App.D.C. 279, 323 F.2d 284, *cert. denied,* 375 U.S. 943, 84 S.Ct. 350, 11 L.Ed.2d 274 (1963). In *Holman* the court refused to halt an SEC adjudicatory proceeding on the ground that one of the commissioners had headed a division with responsibility over the registration statement involved. In *Associated Press v. FCC,* 145 U.S.App.D.C. 172, 448 F.2d 1095 (1971), the court followed *Holman,* not *Amos Treat.* And in *Sterling Drug, Inc. v. FTC,* 146 U.S.App.D.C. 237, 450 F.2d 698 (1971), the court followed *Holman* and referred to *Amos Treat* as a case "where the agency has *very clearly* violated an important constitutional or statutory right." (146 U.S.App.D.C. at 249, 450 F.2d at 710) (emphasis added).

The only instance where *Amos Treat* was followed, in terms of judicial intercession at a non-final stage, was *Fitzgerald v. Hampton,* 152 U.S.App.D.C. 1, 467 F.2d 755 (1972), and that, too, was a *structural* violation— the denial of a public hearing.

If a federal court, district or appellate, is to take jurisdiction before final agency ac-

tion, it can only be in a case of "clear right" such as outright violation of a clear statutory provision (*Leedom*) or violation of basic rights established by a *structural* flaw, and not requiring *in any way* a consideration of interrelated aspects of the merits—which can only be done appropriately on review of a final order. This statement of the doctrine of the exceptions to finality is etched more sharply here than in some of our previous opinions, though it is offered as an accurate statement of what the opinions as a whole were driving at. However, this sharpening of doctrine has aspects of novelty, since earlier expressions referred to denial of basic rights and did not articulate the qualifications of structural flaw, or defiance of an outright prohibition. On that basis, as will be indicated below, I am prepared to agree that the district court's acceptance of jurisdiction not be rescinded retroactively, and to acquiesce in its taking jurisdiction. That still leaves us, however, with the necessity to determine whether the judicial ruling (of disqualification) was proper on the merits. And it was not proper, in my view, for reasons developed in Judge Tamm's opinion for the court.

A strict logician might have ground to attack this concept of a jurisdictional ruling announced for the future. In the same way, a strict logician could assail the doctrine whereby courts deliberately decide, on prudential grounds, to pass over jurisdictional questions and to dispose of a case on the merits. But that doctrine is alive, and fortified by pragmatic considerations involved in sound judicial administration.[20]

The case at bar is one where the very inquiry posed by plaintiff obviously requires some analysis of the views expressed by Chairman Pertschuk, and comparison with the issues as they will actually be focused in the ongoing proceeding. The Government

**19.** *Internat'l Bro. of Teamsters v. Bro. of Railway, Airline and Steamship Clerks,* 131 U.S. App.D.C. 55, 64, 402 F.2d 196, 205, *cert. denied,* 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968).

**20.** The doctrine is established by a number of precedents. *See Secretary of Navy v Avrech,* 418 U.S. 676, 677–78, 94 S.Ct. 3039, 41 L.Ed.2d

1033 (1974); *United States v. Augenblick,* 393 U.S. 348, 351–52, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); *Ripon Society v. National Republican Party,* 173 U.S.App.D.C. 350, 361 n.28, 525 F.2d 567, 578 n.28 (1975) (en banc), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 1148, 47 L.Ed.2d 341 (1976).

puts forward substantial considerations in justification of Chairman Pertschuk's remarks—the proper purpose of calling the public's attention to possible abuses and to factors enhancing public understanding, the propriety of a hortatory role on a wide range of issues, the breadth of the underlying policy issues, as contrasted with the quality of rulings on specific, adjudicative effects (with the corollary likelihood of specific condemnation and stigma). But even if one pretermits all such considerations, the actual conduct of the proceeding may bear significantly on the relationship of the remarks to ultimate issues, let alone dispositions, which are necessary aspects of any claim of prejudicial bias.

These factors make it clear to me that any residue of the *Amos Treat* doctrine is inapplicable to this case.

### C.

If this matter were to arise subsequent to the instant decision, it would in my view have been obligatory of the district court to deny jurisdiction, even assuming prefinality intervention as to the FTC is not confined to a circuit court of appeals, because this was not a case involving a defiance of an explicit statute, or a structural flaw denying basic rights. And in the future any exercise of jurisdiction by a district court should be reversed by a judgment vacating the district court's order, with instructions to dismiss for lack of jurisdiction. However, in this case I join in the order of reversal. This is partly due to the area of doubt left in the wake of our previous rulings, including *Amos Treat* and *Fitzgerald*, making it proper to consider that a more firm rule of prohibiting consideration of the merits should be announced for prospective application, under the *Sunburst*[21] approach—so as to avoid undoing a ruling of district court jurisdiction to consider the merits, that was not unreasonable when made. Reinforcing our decision to consider the merits in this case is the fact that under its not unreasonable assertion of jurisdiction the district court issued a ruling on the merits that for more than a year[22] has constituted a stain on the FTC proceeding. That stain would persist if the appellate court confined itself to a jurisdictional ruling, to the detriment of sound governmental process.

MacKINNON, Circuit Judge (dissenting in part and concurring in part).

I concur in the Court's decision insofar as it holds that (1) the Appellee, Association of National Advertisers (hereafter Association) is not required to exhaust the rulemaking process before filing a court challenge to disqualify one of the Commissioners for bias in such rulemaking proceeding; and (2) that affected parties are entitled to have substantive rules of the Federal Trade Commission proscribing specific unfair or deceptive acts or practices promulgated by fair decisionmakers. However, I cannot agree with the holding of the majority that a member of the Commission engaged in the rulemaking proceeding can be disqualified only upon a showing by clear and convincing evidence that he has an *unalterably closed mind* on matters critical to the disposition of the rulemaking. Also, based on the analysis hereinafter detailed, I would hold that the Chairman has disqualified himself in this rulemaking proceeding even if the majority's "unalterably closed mind" standard is applied.

In my opinion the "unalterably closed mind", where it exists, in many cases is practically impossible to prove, imposes too high a barrier to the public's obtaining fair decisionmakers and is a higher standard than the Supreme Court has applied in its recent decisions. I would require any Federal Trade Commissioner to recuse himself, or failing that to be disqualified, upon a showing by a preponderance of the evidence that he could not participate fairly in the formulation of the rule because of substan-

---

21. *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).

22. The district court ruling issued November 3, 1978. *Association of Nat'l Advertisers v. FTC*, 460 F.Supp. 996 (D.D.C.1978).

tial bias or prejudgment with respect to any critical fact that must be resolved in such formulation.

Also, in my view the majority opinion places too much reliance on the strict rule-making/adjudication dichotomy, applied in earlier cases under the Administrative Procedure Act. The Magnuson-Moss Act creates a rulemaking procedure that combines elements of *both* rulemaking and adjudication, as those functions are exercised under the Administrative Procedure Act, and this blending of the two procedures makes it impossible to look at Magnuson-Moss rulemaking as anything but a combination of the two.

## I. RULEMAKING BEFORE AND AFTER THE MAGNUSON–MOSS ACT.

Congress enacted the Magnuson-Moss Act on January 4, 1975. These amendments were part of the Federal Trade Commission Improvements Act (also known as the Magnuson-Moss Act, hereafter the Act) in which Congress limited the prior wide open authority of the Federal Trade Commission to make "rules which define with specificity acts or practices which are *unfair or deceptive acts or practices* in or affecting commerce . . ." Section 18(1)(B). (Emphasis added). The Act blends some of the administrative procedures—rulemaking and adjudication—that had theretofore been rigidly separated in the Administrative Procedure Act. 88 Stat. 2193, 15 U.S.C. § 57a.

Prior to the Magnuson-Moss Act the Federal Trade Commission possessed great latitude in exercising its informal rulemaking authority. As was pointed out in the Senate debates, the amendment of its rulemaking powers by the Federal Trade Commission Improvement Act, as embodied in S. 356 of the 93rd Congress, 2nd Session (1974), was considered necessary because the Supreme Court "in a recent ruling had given the Federal Trade Commission very broad rulemaking power that was subject only to the due process requirement [and thereafter the House side in its consideration of S. 356 worked out] . . . considerable procedural safeguards . . .

relating to the rulemaking power of the Federal Trade Commission." (Remarks of Senator Taft, 120 Cong.Rec. 40723, December 18, 1974).

The House Committee Report on the bill also complained of the "inadequate" proceedings that the Federal Trade Commission followed in its rulemaking.

The only procedural requirements that the FTC is required to observe are to afford notice of the proposed rulemaking, including a statement of its legal basis and the substance of the proposed rule or a description of the subjects and issues involved, and opportunity for comment in accordance with Section 553 of Title 5, United States Code. On judicial review such rules may only be set aside if they are found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; contrary to Constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedures required by law.

*Your committee believes these rulemaking procedures and the scope of judicial review are inadequate for proceedings in which the integrity of the proposed rule may rest on the resolution of issues of material fact.* We believe that the rulemaking procedures and judicial review provisions of section 202 (described below) afford the safeguards which are needed.

H.Rep.No. 93–1107, June 13, 1974, 93rd Cong., 2nd Sess., 33 U.S.Code Cong. & Admin.News 1974, pp. 7702, 7715. To provide the "needed . . . safeguards" the House passed its bill that with some modifications made by the Senate, resulted in the Federal Trade Commission Improvements Act of 1974, *supra.* It is obvious from the foregoing that one of the principle purposes of the amendments was to improve the "integrity [of Commission rulemaking that *rested*] . . . on the resolution of issues of material fact." This is an obvious reference to the *adjudicative* function involved in the promulgation of rules on un-

fair and deceptive practices by the Commission.

In adopting the Magnuson-Moss (M–M) Amendments Congress authorized the Commission to promulgate rules that defined specific "unfair or deceptive acts or practices in or affecting Commerce" and tightened up the procedures that the Commission was required to follow in exercising this very considerable authority. See section 18(a)(1)(B). The M–M Amendments provided for (1) advance notice of the proposed rule and the reason therefor, (2) an informal hearing with oral or written submissions, (3) cross-examination on disputed issues, (4) right to rebuttal, (5) verbatim transcripts of all oral presentation to be made available to the public; and that (6) the rule be supported by the whole of the rulemaking record, and (7) the basis and purpose of the rule be set forth in a statement. The Commission was also required to take into account (8) the economic effect of any such rule and (9) the effect on small business and consumers. (10) The promulgation of the rule was made subject to judicial review by the Courts under 5 U.S.C. § 706(2) and (11) could be declared unlawful if the Court found it was not "supported by substantial evidence in the rulemaking record . . . taken as a whole."[1] (12) The subsequent amendment or repeal of rules was also made subject to judicial re-

view in the same manner as the original adoption of such rules. In addition (13) the court was required to find the rule to be unlawful if the Commission, by the denial of cross examination or rebuttal submissions, had precluded disclosure of material facts which was necessary for fair determination by the Commission of the Rulemaking proceeding taken as a whole.[2]

Senator Taft commented on the effect of these provisions of the Bill as follows:

I would particularly like to point out that the provisions relating to rulemaking, power are very broad. *When we are dealing with the FTC, its authorizations, and areas of procedure we are not dealing with what we usually consider to be a rulemaking power of a Government agency.*

We are dealing with an agency where, under the antitrust laws, rules are often made that relate to very specific cases, particularly specific industries, and prescribe certain requirements relating to those industries. They perhaps even limit the type of material that can be produced, the type of material that can be sold and how it can be sold.

In other words, the actual rights of individuals and business concerns are involved here.

---

1. The statute provides:

"(3) Upon the filing of the petition under paragraph (1) of this subsection, the court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5, [United States Code] and to grant appropriate relief, including interim relief, as provided in such chapter. The court shall hold unlawful and set aside the rule on any ground specified in subparagraphs (A), (B), (C), or (D) of section 706(2) of title 5. [United States Code] (taking due account of the rule of prejudicial error), or if—

"(A) the court finds that the Commission's action is not supported by substantial evidence in the rulemaking record (as defined in paragraph (1)(B) of this subsection) taken as a whole, or

"(B) the court finds that—

"(i) a Commission determination under subsection (c) that the petitioner is not entitled to conduct cross-examination or make rebuttal submissions, or

"(ii) a Commission rule or ruling under subsection (c) limiting the petitioner's cross-examination or rebuttal submissions,
has precluded disclosure of disputed material facts which was necessary for fair determination by the Commission of the rulemaking proceeding taken as a whole.
88 Stat. 2195–2196, 15 U.S.C. § 57a(e)(3).
§ 18(e)(1)(B) provides:

"(B) For purposes of this section, the term 'rulemaking record' means the rule, its statement of basis and purpose, *the transcript required by subsection (c)(4),* any written submissions, and any other information which the Commission considers relevant to such rule. (Emphasis added).
§ 18(c)(4) provides:

"(4) A verbatim transcript shall be taken of any oral presentation, and cross-examination, in an informal hearing to which this subsection applies. Such transcript shall be available to the public.

2. *Id.*

So we are really dealing not merely with the rulemaking proceedings, but in many cases, for all practical purposes, with *an adversary proceeding.*

120 Cong.Rec. 40723–40724, December 18, 1974. (Emphasis added).

It is thus apparent that the promulgation of unfair or deceptive practices under the Magnuson-Moss Act differs greatly from mere informal rulemaking under the tight compartments first established by the Administrative Procedure Act in 1946 (60 Stat. 238–239).

The majority's opinion criticizes the characterization by the District Court of Federal Trade Commission rulemaking under the Magnuson-Moss Act as "hybrid" or quasi-adjudicative on grounds that it "ignores the clear scheme of the APA". Of course such Magnuson-Moss Act rulemaking ignores the clear scheme of the APA. That was one of the stated and obvious purposes of the Act—to provide greater protection to the public that would be affected by the FTC rules, by providing some reasonable safeguards when the Commission promulgated rules prescribing specific "unfair or deceptive acts or practices." [3] Rulemaking under the Administrative Procedure Act prior to the Magnuson-Moss Act was ordinarily cast either in an adjudicatory or rulemaking context but the Magnuson-Moss Act changed all of this for rulemaking of unfair or deceptive acts or practices by the Federal Trade Commission.[4] See Majority Opinion p. —— of 201 U.S.App.D.C., p. 1159 of 627 F.2d.

The Court's opinion is couched too much in a rulemaking/adjudication dichotomy and tries to pigeonhole Commission action into one or the other. For instance, it states that the "presence of procedures not mandated by Section 553 . . . does not . . . convert rulemaking into quasi-adjudication . . . ." That statement however blinks at the reality that exists in this instance of rulemaking. It should also be noted that Professor Davis, in setting forth his suggested "Official Notice" for rulemaking proceedings, defines "*adjudicative facts* [as] facts relating to the parties to the case . . . when a rule is formulated in an on-the-record proceeding." [5] The Commission's action in promulgating the instant rules is required to be supported by substantial evidence in the rulemaking *record* as a whole. However, regardless of labels, the procedures required by M–M in this case certainly converts the Commission's action into something that is not wholly covered. by Section 553 and that is not wholly quasi-adjudication. The Act creates a new form of Commission action that is outside the informal rulemaking category as previously covered solely by section 553, by the addition of elements that definitely involve adjudication.

## II. ADJUDICATIVE CHARACTER OF MAGNUSON–MOSS ACT PROCEEDINGS.

Professor Davis has pointed out that some rulemaking may involve the determination of adjudicative facts:

The first step is probably to recognize that the reality [of rulemaking procedures] is a spectrum rather than a dichotomy; some facts are clearly adjudicative, some are clearly legislative, some are probably one or probably the other but not clearly, and some seem impossible to classify. So the adjudicative or legislative character of facts is a variable, and other variables must also be taken into account—the degree of doubt or certainty

---

3. *Id.*

4. *See* this court's opinion in *Chocolate Manufacturers Association of United States, Inc. v. F. T. C.*, 199 U.S.App.D.C. 29, 617 F.2d 611 (D.C.Cir. 1979) in which we referred to the Magnuson-Moss Act as "a codification of the hybrid approach between adjudication and rulemaking". 199 U.S.App.D.C. at p. 33, 617 F.2d at p. 615.

5. Davis, Administrative Law of the Seventies, § 15.00–8, at 376 (1976). There is no indication that Professor Davis intended to refer to "rules . . . made on the record", the phrase that triggers formal rulemaking under §§ 556, 557 of the Administrative Procedure Act.

about the facts, and the degree of their bearing upon the controversy. When facts are clearly adjudicative, disputed, and critical, a party should be entitled to all the procedural protections of a trial. When facts are legislative, reasonably clear, and peripheral to the controversy, the tribunal may assume them without even mentioning them. *The problem cases are those in which the three variables pull against each other.*[6] (Emphasis added).

These observations clearly describe many of the aspects of the Magnuson-Moss Rulemaking and in the last sentences reach the facts of this case.

The adjudicative character of some of the proceedings under the Magnuson-Moss Act is also reflected in the April, 1979 recommendation made by the Administrative Conference with respect to the trade regulation rulemaking project of the Federal Trade Commission. Therein the Conference stated:

As a general practice the Commission, after the close of the first period of submission of written comments, should conduct a legislative-type hearing, following which it should determine whether there are "disputed issues of material fact it is necessary to resolve". If there are determined to be such issues, they should be designated with specificity, and a *quasi-adjudicative hearing*, in accordance with section 18(c) of the Federal Trade Commission Act, should be held on them.

April, 1979 Recommendations of the Administrative Conference, paragraph 12. (emphasis added)

One should not be blind to the fundamental changes made in Commission procedures for regulating unfair and deceptive acts and practices by the Magnuson-Moss Act. The Separate Views on Title II of the Act by 12 members of the House Commerce Committee that strongly supported the new rulemaking procedures of the Magnuson-Moss Bill, also indicated that Congress knew that it was making substantial changes in the informal rulemaking pro-

ceedings provided for in section 553 of the Administrative Procedure Act. *Cf., Commission's pre-1975 Rules and Procedures,* Section 1.16 to (c), (d). The statement of the 12 members included the following:

When a statute provides authority to a Federal administrative agency to issue rules of general applicability but is silent on the procedures which the agency is required to follow in issuing such rules, only the procedural requirements of Section 553 of Title 5, United States Code apply to any rulemaking proceeding undertaken pursuant to that authority. This means that the agency is required to do no more than to provide notice of the proposed rulemaking in the Federal Register and allow interested persons the opportunity to submit written comments on the proposal. *There is no right* to appear in person before the agency, to cross-examine, to submit rebuttal evidence or *to insist that the agency decide solely on the basis of information available at the public hearing.* Also, the scope of judicial review under such procedures is very narrow. On judicial review, such rules could be set aside if they were found to be arbitrary, capricious or an abuse of discretion, unconstitutional, in excess of statutory authority or without observance of procedures required by law. (H.R.Rep. No. 93–1107, 93rd Cong.2d Sess. (1974) at 85, U.S.Code Cong. & Admin.News 1974, pp. 7702, 7751.) (Emphasis supplied.)

These criticisms of informal rulemaking under Section 553 were what the 12 members considered they were changing for the making of unfair and deceptive acts and practices rules by the Federal Trade Commission under the Magnuson-Moss Act.

## III. DOES THE SUBSTANTIAL EVIDENCE STANDARD OF THE MAGNUSON–MOSS ACT APPLY ONLY TO DISPUTED ISSUES OF MATERIAL FACT OR DOES IT ALSO APPLY TO FINDINGS AND DETERMINATIONS OF LEGISLATIVE FACT?

The substantial evidence scope of review of a Magnuson-Moss proceeding further il-

---

**6.** Davis, Administrative Law of the Seventies, § 15.00–8, at 375 (1976).

lustrates its adjudicatory nature. However, the Commission contends that "the substantial evidence" standard for judicial review was intended only to apply to "the findings and conclusions of the Commission with regard to disputed issues of material fact on which the rule is based" and "would not apply to findings or determinations of legislative fact".[7] The Conference Report does make this statement but the plain language of Section 18(e)(3)(A) provides that the Court shall set aside the rule if:

> (A) the court finds that the Commission's action [promulgating the *rule*] is not supported by substantial evidence in the rulemaking record . . . taken as a whole.

15 U.S.C. § 57(e)(3)(A).

The Commission's contention in this respect, which seeks to answer attacks upon the "rule" that the Commission promulgated, in addition to being contrary to the language of the statute, is also contrary to the statements of Senator Moss and Representative Broyhill and others made on the floor of Congress during passage of the Magnuson-Moss Act. The reason for such amendments to the Commission Act was explained by Senator Moss as follows:

> The concurrent resolution corrects a technical deficiency in the conference report whereby the words "with regard to disputed issues of material fact on which the rule was based" modified both the words "findings" and "conclusions" whereas they pertained only to findings. In order to clarify the situation, *the word "action" was chosen to indicate the intention to have factual determinations reviewed on the basis of substantial evidence.* Conclusions arising from these factual determinations would be reviewed as is normal: *Do the facts supported by substantial evidence support the conclusions on the basis of logic.* (120 Cong. Rec. 40725 (Dec. 18, 1974) (remarks of

Sen. Moss) (emphasis added); *accord, id.* at 40724 (remarks of Sen. Taft).)

Similarly as Representative Broyhill observed:

> [I]t is necessary to clarify the language in the conference report, not because of any disagreement among the conferees but because of some legal interpretation of the language which was included in the conference report. *We want to make crystal clear that any rules issued by the commission must be based upon the substantial evidence that is developed in consideration of the rule.* That is the purpose of the amendment—to clarify the provision in the Judicial Review section. (120 Cong.Rec. 41408 (Dec. 19, 1974) (remarks of Rep. Broyhill) (Emphasis added).)

Senator Taft remarked:

> [A]s I understand it . . . [the resolution] will have the effect of amending that provision to read that the clerk [sic] [court] finds that the Commission action is not supported by substantial evidence in the rulemaking record taken as a whole. (120 Cong.Rec. 40724 (Dec. 18, 1974) (remarks of Sen. Taft).)

This legislative history indicates, and Representative Broyhill's statement is the clearest, that "substantial evidence" in the rulemaking record *as a whole* is required to support any rule proscribing any specific unfair or deceptive act or practice promulgated by the Commission. To the extent that the statement by Senator Moss expressed a different formulation, it only varied slightly to require that any rule that the Commission adopted must follow *logically* from findings of fact supported by substantial evidence on the record as a whole. If there is any material difference in the actual application of these two analyses, it is relatively immaterial in determining the Chairman's disqualification in this case, be-

---

**7.** Whether the "disputed issues of material fact" involve adjudicative or legislative facts is clearly not settled. The majority opinion finds that the Section 18 hearing on disputed issues of material fact does not involve legislative facts—and also cites authority that it does.

Maj. op. at pp. —— —— of 201 U.S.App.D.C., pp. 1162–1165 of 627 F.2d.

I note only that whatever characterization be accorded such disputed issues of material fact, the Commission is not authorized to prejudge them prior to the Section 18 hearing.

cause both point to the controlling effect that results from decisions of the Commission on factual findings and conclusions therefrom and these are the precise areas where the Chairman by his prior statements and conduct has indicated his bias and prejudgment.

To all of these comments with respect to Section 18 rulemaking should be added an extract from a recent article by Professor Antonin Scalia, the former Chairman of the Administrative Conference of the United States. In the article, Professor Scalia decries the "balkanization of administrative law" and blames (besides this court) Congress' increasing interest in promulgating unique procedural requirements with each new statute. Scalia would opt instead for "standardizing mandatory administrative procedures within a manageable number of well-known and well-litigated forms," and describes how Congress' disinclination to do so in the Magnuson-Moss Act necessarily produced the result reached by Judge Gesell in the court below.

> That such a consummation is devoutly to be desired is exemplified—indeed, almost caricatured—by the recent case of *Association of Nat'l Advertisers, Inc. v. FTC* [460 F.Supp. 996 (D.D.C.1978)], involving a petition to disqualify the Chairman of the FTC for prejudice in a rulemaking proceeding conducted pursuant to the peculiar procedures of the FTC Improvement Act of 1975 . . . *Chairman Pertschuk had forcefully expressed his firm views concerning the subject of the proceeding*—FTC regulation of children's advertising. Such *expression of prejudice would clearly have been disqualifying in formal adjudication and almost certainly in formal rulemaking.* It has never been thought to be disqualifying in informal rulemaking, *though it is admittedly difficult to recall so vigorous an expression of prejudgement in a pending proceeding.* But the FTC Improvement Act had given what it called informal rulemaking so many of the characteristics of *formal adjudication (or formal rulemaking)* that it was difficult to decide which standard of conduct should govern.

As Judge Gesell noted, it was "in fact a hybrid proceeding, unique to the Federal Trade Commission." [*Id.* at 997.] The court's disqualification of Chairman Pertschuk was based on constitutional grounds—to which the foregoing considerations should be irrelevant. I think, however, that the issue should have turned upon statutory intent with respect to a procedural area (expression of bias or prejudice) not specifically addressed by the APA. On that point, the nature of the statutorily prescribed procedures would be crucial, and infinite variation would make predictability most difficult. (Scalia, *Vermont Yankee: The APA, the D.C. Circuit and the Supreme Court,* 1978 Sup.Ct.Rev. 345, 408–409 n. 255.) (Emphasis added).

Thus, Professor Scalia agrees that the result reached by Judge Gesell, with which I agree, is dictated by the unusual procedural model of the Magnuson-Moss Act. His italicized characterization of the "[forceful and] vigorous . . . expression of prejudgment [and] . . . prejudice" is a sound evaluation of the prejudicial character of the Chairman's remarks and conduct by an impartial and learned observer. It is also my view that Chairman Pertschuk's disqualification can be supported on statutory grounds, i. e., the statute requires action to be determined by the Commission on the record evidence as a whole; such determination necessarily implies a fair determination, otherwise the presentation of evidence is a hollow formality.

## IV. THE MAJORITY'S DESCRIPTION OF THE CHAIRMAN'S REMARKS & CONDUCT.

The majority opinion holds, and I agree with such holding, that "The appellees have a right to a fair and open proceeding; that right includes access to an *impartial decisionmaker.*" Maj. op. p. —— of 201 U.S. App.D.C., p. 1174 of 627 F.2d. However, the majority considers that one qualifies as an "impartial decisionmaker" unless he is shown by clear and convincing evidence to have an *unalterably closed mind* on matters

critical to the children's television proceeding. This rule would establish a legal principle that evidence of bias and prejudice would not be disqualifying unless it could surmount a fence that is horse high, pig tight and bull strong. In my view that is too much protection for a biased decisionmaker. In a great many instances it would deprive the public of decisionmakers that are actually "impartial".

The current case is a good example and also illustrates how strong evidence of prejudgment can be played down to almost sanitize the attitudes expressed. Such softening of the Chairman's remarks is illustrated by the following excerpts from the majority opinion:

> Chairman Pertschuk's remarks, considered as a whole represent discussion, and perhaps advocacy, of the legal theory that might support exercise of the Commission's jurisdiction over children's advertising. The mere discussion of policy or advocacy on a legal question, however, is not sufficient to disqualify an administrator. To present legal and policy arguments, Pertschuk not unnaturally employed the factual assumptions that underlie the rationale for Commission action. The simple fact that the Chairman explored issues based on legal and factual assumptions, however, did not necessarily bind him to them forever. Rather, he remained free, both in theory and in reality, to change his mind upon consideration of the presentations made by those who would be affected.

Maj. op. pp. ———–—— of 201 U.S.App. D.C., pp. 1171–1172 of 627 F.2d. [Footnote omitted].

The opinion then indulges in a more particularized discussion of some of the specific comments that the Chairman made and that are not denied on this record, and further concludes:

> The materials [Pertschuk's comments], merely demonstrate that Pertschuk discussed a legal theory by which the Commission could adopt a rule, if circumstances warranted. The statements do not demonstrate that Chairman Pert-

schuk is unwilling or unable to consider rationally argument that a final rule is unnecessary because children are either unharmed by sugared products or are able to understand advertising. The appellees have failed to make a clear and convincing showing that Chairman Pertschuk has an unalterably closed mind on matters critical to the children's television proceeding.

Maj. op. pp. ———–—— of 201 U.S.App. D.C., pp. 1173–1174 of 627 F.2d.

This bland characterization of the opinions and attitudes expressed in public and private by Chairman Pertschuk completely fails to portray the "prejudgment" and bias that is indicated by his actual remarks and conduct. It nowhere expresses the predisposition that his remarks actually revealed and thus fails accurately to evaluate the Chairman's state of mind on children's TV advertising. And this is not all; the majority raises even further obstacles to disqualifying a Commissioner on the ground of actual bias by asserting:

> We are concerned that implementation of the *Cinderella* standard in the rulemaking context would plunge courts into the midst of political battles concerning the proper formulation of administrative policy. We serve as guarantors of statutory and constitutional rights, but not as arbiters of the political process. Accordingly, we will not order the disqualification of a rulemaker absent the most compelling proof that he is unable to carry out his duties in a constitutionally permissible manner.

Maj. op. p. ——– of 201 U.S.App.D.C., p. 1174 of 627 F.2d.

No mention is made of the necessity that the rulemaker be a fair decisionmaker as implicitly required by the statute. There is no support for this attempt to inject "political" fears as a factor to negate disqualification. Of course, some can find politics in most everything done by government, but there is no showing here that it would be an improper interference with the "political process" to apply the proper rule of disqualification, any more than it was when this

court found Chairman Dixon of the Federal Trade Commission to be disqualified to participate in a particular FTC adjudicative matter. *Cinderella Career and Finishing Schools, Inc. v. FTC,* 138 U.S.App.D.C. 152, 425 F.2d 583 (D.C. Cir. 1970). While it may have been Congress' design to place Commissioners in the dual roles of policymaker and decisionmaker, it was also Congress' intent that parties to Magnuson-Moss Act rulemaking have their evidence considered fairly and impartially. Hence, in disqualifying a decisionmaker who cannot decide with the requisite degree of fairness and impartiality, we would protect the political process, rather than interfere with it.

In addition to understating the Chairman's remarks, the majority does not attempt to actually portray them, or to apply them in all their verbiage, against the standard for disqualification that the majority establishes. This needs to be done.

I begin such analysis with the definite opinions expressed by the Chairman. On TV's Today Show on October 31, 1977 he admitted that "the implicit indication of [his] personal opinions in these replies are [sic] self-evident." By this statement he recognized that it is the *implicit indications* of his personal opinions that should be evaluated. He next stated: "I have some serious doubt as to whether any television advertising should be directed at a 3 or 4 or 5 year old, a pre-schooler . . . we have never treated children as commercial objects in our society." This expresses a very firm opinion that, by its advertising, television *was* treating such children as "commercial objects"—presumably trigger words in his vocabulary.

Next, in response to the question whether he would like to see the Federal Trade Commission ban children's advertising *altogether* he replied "not necessarily. But we've not excluded the possibility of bans on certain advertising of certain products to children." In the next paragraph, in an apparent attempt to save the Commission from the taint of any bias that his personal statements indicate, he attempts to spread the responsibility by stating that there are

4 other Commissioners and consequently his views do not bind the others. However, a Commission is prohibited from acting with even *one* biased Commissioner. *See American Cyanamid Company v. FTC,* 363 F.2d 757, 767 (6th Cir. 1966); *Berkshire Employees Association of Berkshire Knitting Mills v. NLRB,* 121 F.2d 235, 239 (3rd Cir. 1941). Then the Chairman stated that the Commission has "not as a body yet approached the question of a remedy for the *evils we see* in children's advertising." So the Commission (we) had already determined that the advertising was "evil". Apparently the only issue was what remedy to apply.

Next, in his speech to the Action for Children's Television Research Conference at Boston on November 8, 1977, he referred to the "*moral myopia* of children's television advertising." (Emphasis added). He also stated that "advertisers *seize* on the child's trust and *exploit* it as a weakness for their gain." (Emphasis added). These remarks evidence definite conclusions, definite opinions and a biased slant. Later he stated: "using sophistication techniques like fantasy and animation, they [TV advertisers] *manipulate* children's attitudes". (Emphasis added). This also indicates a prejudgment of the purpose and intent of TV advertisers.

He then argued:

Why isn't [the] . . . principle [that those responsible for children's well being are entitled to the support of laws designed to aid discharge of that responsibility] applicable to television advertising directed at young children? Why shouldn't established legal precedents embodying this public policy be applied to protect children from this *form of exploitation?* In short, why isn't such advertising unfair within the meaning of the Federal Trade Commission Act and, hence, unlawful? (Emphasis added)

Can any reasonable person contend that such remarks do not indicate that he has prejudged TV Advertising and decided that it *exploits* children?

He next delves into the millions of family relationships and indicates that he has decided that Commission action is required because he finds:

[children] cannot protect themselves against adults [the advertisers] who exploit their present-mindedness . . . (and exploit their "credulousness").

He has already concluded that children under five in the United States are not sufficiently under parental control to prevent them from begin victimized by TV advertising. The foregoing remarks indicate that Chairman Pertschuk has already decided that children are being subject to "exploitation" by children's advertising. That may be so, and the evidence might prove it, but it is apparent that he so decided before any evidence was introduced.

Finally he asserts:

Shouldn't society apply the law's strictures against commercial exploitation of children, and the law's solicitude for the health of children to ads that threaten to cause imminent harm—harm which ranges from increasing tooth decay and malnutrition to injecting unconscionable stress into the parent-child relationship?

This indicates the Chairman has already formed an opinion that television advertising is interfering with the relationship between parents and their children that only intervention by the Federal Trade Commission can correct.

Also, his recounting that he has talked about the "*unfairness* of advertising aimed at children" indicates he has concluded that such advertising is "unfair". With such conclusion already reached the only problem is how to prove it and what to do about it. He thus indicated he is not seeking to find what the evidence proves but what evidence can be found to prove his prejudgment. Whether it is "unfair" or not is the precise issue that was supposed to be the subject of the hearings.

In addition, he stated that "*only a ban on the advertising of these products on programs directed towards the young child can remedy their inherent defect,* although we must explore all remedial approaches to the problem." (Emphasis added). In other words, he has concluded that children's advertising has "inherent defect[s]", which he does not identify, "that only a ban" can

correct the situation, and that he would explore other approaches.

In his final statement to the Conference he stated:

If the Commission is to reach sound and reasoned judgments, it must also hear from the parents, the teachers, the pediatricians, the dentists, those health and education specialists on whom we rely for the advocacy of our children's best interest. *We must be rigorous and open-minded in our analysis of both law and fact.* At stake are fundamental questions about the extent to which our society will permit the treatment of children as commercial objects rather than formative human beings entrusted to our care.

The majority opinion refers to the statement that "we must be rigorous and open-minded in our analysis of both law and fact" as an indication of the fairness of the speaker. However, in the context in which this speech was delivered, these remarks appear much more as an admonition that the Commissioners must steel themselves against those who would "permit the treatment of children as commercial objects [and stop the Commission (we) from] hear[ing] . . . the parents, the teachers, the pediatricians, the dentists [etc. and those others who are advocating what he terms to be] the children's best interest".

Finally he postulates the problem as being to determine the "extent to which [the Commission is] to permit the treatment by television of children as commercial objects."

In a 1978 Newsweek article the Chairman is quoted as follows:

'Commercialization of children has crept up on us without scrutiny or action', says Michael Pertschuk, the agency's new chairman. '*It is a major, serious problem.* I am *committed* to taking action.' (Emphasis added).

This statement is not denied. That he is "committed to taking action" cannot be construed as indicating that he is merely going to urge fellow Commissioners to hold

hearings but rather that he has already concluded that "a major, serious problem" exists and the only remaining problem is to decide what the Commission should do about it. This supports what he has said before, that practically his sole concern is *what* action the Commission should take.

Finally we come to several letters written by the Chairman. Their full contents should be noted:

November 9, 1977

MEMORANDUM
TO: Charlie Ferris
FROM: Mike Pertschuk

Now after shooting my mouth off for three months here's our effort at putting some legal underpinnings under our initiatives on children's advertising. I should probably come over in the next couple of days to make sure that we don't cross each other inadvertently.

\* \* \* \* \* \*

November 9, 1977

MEMORANDUM
TO: Coleman [sic] McCarthy
FROM: Mike Pertschuk

Coleman, I know you share my concern in raising public consciousness to the part we play as a society for permitting children to be made commercial objects. I thought you'd want to see this statement in which I've tried to establish underpinings [sic] for a *fundamental assault* on television advertising directed toward young children.
(Emphasis added).

\* \* \* \* \* \*

November 9, 1977

MEMORANDUM
TO: Senator Stevens
FROM: Mike Pertschuk

Senator, I thought your floor statement on children's advertising was just great and really appreciate your support once again.
I thought you might be interested in the speech I gave in Boston yesterday in which I tried to lay out the legal underpinings [sic]—which I'm convinced are strong—for decisive action by the Com-

mission in areas of children's advertising abuses. Thanks.

On November 17, 1977 he wrote the Honorable Donald Kennedy as follows:

November 17, 1977

Honorable Donald Kennedy
Food and Drug Administration
Parklawn Building
5600 Fishers Lane
Rockville, Maryland 20852
Dear Don:

Setting legal theory aside, the truth is that we've been drawn into this issue because of the *conviction*, which I know you share, that one of the *evils* flowing from the *unfairness* of children's advertising is the resulting distortion of children's perceptions of nutritional values. I see, at this point, our logical process as follows: children's advertising is inherently unfair. As a policy planning agency we have to make judgments as to our priorities. The first area in which we choose to act is an area in which a substantial controversy exists as to the health consequences of encouraging consumption of sugared products (not just cereals). With this formulation we do not have to prove the health consequences of sugared cereals. What we do have to prove is that there is a substantial health controversy regarding the health consequences of sugar—a much lower burden of proof.

I'm convinced that the convergence of public policies regarding the commercial exploitation of children with the health controversy over sugared products give us a stronger base and frankly deal directly with the underlying concerns which prompt our action.

Sincerely yours,
Michael Pertschuk

(Emphasis added).

These letters indicate that by November 17, 1977, the Chairman had a *"conviction"* that there are *"evils* flowing from the *unfairness* of children's advertising . . ."* and he had been vigorously marshalling sentiment throughout the nation for a "fundamental assault on television advertising directed toward young children." Letter of

November 9, 1977 to Colman McCarthy. So by that date he was already *convinced* that children's advertising was *evil* and *unfair.* He then advocates the legal theory for authorizing the Commission to take such action as he might advocate. His final paragraph is likewise strong evidence of the extent of his prejudgment.

> I'm *convinced* that the convergence of public policies regarding the commercial exploitation of children with the health controversy over sugared products give us a stronger base and frankly deal directly with the underlying concerns which prompt our action. (Emphasis added).

In his letter of November 9, 1977 to Charlie Ferris he said that "after shooting my mouth off for three months here's our effort at putting some legal underpinings [sic] under our initiatives on children's advertising". He has already concluded, as his letter to Colman McCarthy indicates, that society in an "*evil*" manner, possibly attributable to "*moral myopia*", has permitted children to be made commercial objects.

Thus, if the Notice of Rulemaking were truthful, so far as Chairman Pertschuk's views were concerned, it would have stated in substance:

> The Commission has decided to make a fundamental assault upon Children's Advertising on TV because we are convinced that it is *evil*, unfair and allowed solely because of the moral myopia of the public and the industry. We solicit comments as to whether it should be prohibited entirely or to some lesser degree.

## VI. AGENCY RULEMAKING AND CONGRESSIONAL LEGISLATION— COMMISSIONERS AND CONGRESSMEN.

Notwithstanding that the majority opinion holds that a "fair decisionmaker" is to be guaranteed for this rulemaking, the opinion seeks to obviate such guarantee, if I read the opinion correctly, by holding that Commissioners in their Magnuson-Moss rulemaking are to be considered the same as Congressmen, and the fairness with which they approach their rulemaking cannot be attacked because Congressmen are not subject to similar constraints in enacting legislation.

To reach such result the majority opinion compares Section 18 unfair and deceptive practice rulemaking by the Federal Trade Commission to the enactment of legislation by Congress and likens the appointed Commissioners of the Federal Trade Commission to the Senators and Representatives elected to Congress. It points out that courts have not imposed procedural requirements on legislatures and that there is nothing to restrict Congressmen from prejudging factual and policy issues.[8] The opinion also notes that legislators must have the ability to exchange views with constituents and suggest public policy dependent upon factual assumptions.

The majority opinion quotes the unprecedented views of Professor Glen O. Robinson, a former member of the Federal Communications Commission, as follows:

> Although members of agencies such as the FCC certainly do perform significant judicial functions in deciding individual cases, they perform even more tasks of a legislative or an executive character. When the FCC, for example, promulgated regulations barring common ownership of local newspapers and broadcast stations, it performed a legislative task, pure and simple. In reaching the decision, the Commission was neither bound by, nor

---

**8.** The Majority opinion states:

> No court to our knowledge has imposed procedural requirements upon a legislature before it may act. Indeed, any suggestion that congressmen may not prejudge factual and policy issues is fanciful. A legislator must have the ability to exchange views with constituents and to suggest public policy that is dependent upon factual assumptions. Individual interests impinged upon by the legis-

lative process are protected, as Justice Holmes wrote, 'in the only way that they can be in a complex society, by [the individual's] power, immediate or remote, over those who make the rule.' *Bi-Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915).

Maj. op. p. —— of 201 U.S.App.D.C., p. 1165 of 627 F.2d.

expected to conform to, the confining procedures or standards of a court. [The FCC, however, was not acting under the strictures of the Magnuson-Moss Act] Why then should the decisionmakers be stamped from a judicial case? *Insofar as the agency is delegated broad legislative powers and responsibilities, would it not be at least as appropriate to measure agency members against standards used to evaluate legislators?* Such standards would place agency members on a better standing with respect to judges and would create an entirely new frame of reference for assessing agency performance. The supremacy of carefully reasoned principle—the supposed ideal of judicial decision—necessarily would yield to the dictates of political compromise and expediency, which are the accepted hallmarks of legislative action. Correspondingly, the standard for evaluating the composition of the agencies would shift from an emphasis on professional training to an emphasis of representativeness. (Emphasis added) (Comment added)

This appears to be the source of the court's opinion that converts what is only a suggestion of Professor Robinson into a decision holding that the Commissioners of the Federal Trade Commission have the same authority as members of Congress. What an extreme ruling. Professor Robinson was honest when he admitted that this proposal "would create an entirely new frame of reference for assessing agency performance" but his article can be searched throughout without finding any *suggestion* that a *court* in one of its decisions could convert Federal Trade Commissioners into the equivalent of Congressmen. Professor Robinson's proposition could only be implemented by Congressional action, since agencies are purely creatures of congress.

It is true that legislators are not required to make findings of fact to support their legislation and that they cannot be disqualified by any court for bias, but there are other safeguards in the legislative process that compensate for the absence of such safeguards as are expressly imposed or implicit in the administrative process. First of all, legislators are *elected* by the voters of their district, and those in the House are elected for a relatively short term—only two years. They can be turned out very quickly if any bias they disclose offends their constituents. Secondly, there is a protection in the sheer size of Congress—535 members of the House and Senate—that implicitly diffuses bias and guarantees that impermissible bias of individual members will not control. There is safety in numbers and a biased Congressman soon loses influence among the other members, if he ever acquired any. Also, the two house system and the Presidential veto are tremendous guarantees that legislation will not be the result of individual bias or even the impermissible bias of one house.[9]

---

**9.** Moreover, the personal bias and prejudgment of an individual member of Congress is ordinarily a relatively immaterial matter because of the large number of members in each house. The House does provide that a member shall vote on each question unless he has a "direct personal or pecuniary interest in the event of such question." Rule VIII, Rules of the House of Representatives (1979). Most of the cases that arise involve pecuniary interests of the members and it is the practice that the member himself determines the question. Dechler's Procedures, Ch. 30, §§ 4.2–4.7; V Hind's, §§ 5950, 5951; VIII, 3071. In III Hind's § 2518 it is reported that Representative Boatner disqualified himself from voting in committee with respect to an investigation of a judge because he had preferred charges against the judge in the prior Congress. This decision by Representative Boatner to disqualify himself is par-ticularly illustrative of the delicacy that should be applied in deciding on disqualification of officials who take a position that stands out in advocating a certain course of subsequent action.

Representative Boatner's personal interpretation of the disqualification rules is all the more significant because the weight of authority is that, short of a man voting on his own case, there is no authority in the House to deprive a member of the right to vote. V Hind's §§ 5937, 5952, 5959, 5966, 5967; VIII § 3072. Such situations raise extremely delicate questions of fairness, so public officials, like Congressman Boatner, and judges, should consider the appearance of fairness they present to the public, and most of all should recognize their own prejudgment and bias when it is apparent to the public.

Because these legislative safeguards were not applicable to Federal Trade Commissioners, Congress saw fit to impose other safeguards, i. e., (1) confirmation by the Senate, (2) limited terms for FTC Commissioners, (3) public notice and mandatory public hearings when proposing legislative type rules, (4) cross-examination, rebuttal, a public written record, a statement of reasons and purpose, and (5) a requirement that *whatever rule is promulgated be supported by substantial evidence on the record as a whole*, and (6) be subject to judicial review and other safeguards previously noted.

Congress considered these safeguards to be necessary to provide the same degree of protection that exists in Congress with respect to its exercise of legislative power. So the answer to that portion of the court's opinion that makes Congressmen out of FTC Commissioners, as I interpret it, is that the majority opinion elsewhere in citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), recognizes that such a fundamental change in agency procedure cannot be made by the courts. We cannot make Congressmen out of Commissioners any more than we could by our decision make errand boys for the court out of the members of the Nuclear Regulatory Commission. Courts cannot reduce or circumscribe statutory agency power and by the same token they cannot grant powers that only Congress can give. Courts have no power to supplant the Senate, House and President by creating a legislative body of five members whose acts would not be subject to judicial review except to the same extent as Congressional statutes. Such a body would actually be a five man Federal Trade *Congress.*

## VII. FAIRNESS AND DISQUALIFICATION.

The majority refers to the act of Congress that authorizes the Commission to prosecute unfair and deceptive acts and practices by rulemaking and contends that due process does not require more procedures than Congress has provided. *Vermont Yankee Nuclear Power Corp., supra,* 435 U.S. at 524, n. 1, 98 S.Ct. 1197. However, a *fair* rulemaker is not a *"procedure"*; it is an implicit requirement that flows from any situation that calls for a result to be reached on evidence.

The opinion then jumps to assert that since

Congress is under no requirement to hold an evidentiary hearing prior to its adoption of legislation . . . . Congress need not make that requirement when it delegates the task to an administrative agency. [But it did.] (*Bowles v. Willingham,* 321 U.S. 503, 519, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (Citing *Bi-Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915)). Accordingly, we must apply a disqualification standard that is consistent with the structure and purposes of section 18. (Comment added). Maj. Op. p. —— of 201 U.S.App. D.C., p. 1166 of 627 F.2d.

I have no disagreement with the statement in the last sentence. My disagreement extends only to the conclusion the majority eventually reaches, i. e., that their result *"is consistent with the situation and purposes of section 18."* On this point I concur with Professor Scalia that the statutory intent evident in Section 18 requires Magnuson-Moss rulemakers to be without disqualifying bias or prejudgment.

The next assertion, by the author of the *Cinderella* opinion, is that *we* never intended the *Cinderella* rule to apply to a rulemaking procedure such as the one under review." (Emphasis added). So far as the other judges of the division of the Court that decided the *Cinderella* case are concerned, I believe this is an overstatement. *We* never expressed any opinion as to the application of our ruling in *Cinderella* to a Magnuson-Moss rulemaking proceeding. That issue was not involved in the case. We never concluded that the same principle did, or did not, apply to such proceedings. We applied the rule to disqualify the Chairman in *Cinderella,* a case involving an *adju-*

*dication*, because the parties had a right to a fair decisionmaker. Since, as the majority admits, a fair decisionmaker also is required here in the promulgation of substantive rules establishing specific unfair and deceptive acts and practices, no reason exists why the same rule should not be applied to this case in order to assure fair decisionmakers. How else could fair decisionmakers be obtained?

I would not restrict members of a regulatory commission in their public discussion of policy issues, and there is nothing in the requirement that rules should be promulgated after fair hearings by unbiased Commissioners that would prohibit administrators from discussing "the wisdom of various regulatory positions." The office of the Commissioner contemplates some such activity but that does not justify their overstepping ordinary bounds of reasonableness to become loud advocates and spend three months haranguing the public with their prejudgment on basic factual issues that they must eventually decide. Reasonable public discussion should not be restricted and our history indicates that requiring fairness in our decisionmakers has not inhibited public discussion. Very few public officials serving as members of regulatory agencies have ever been charged with overstepping reasonable bounds. But when a decisionmaker, who must rise above partisanship, descends to vigorous and consistent advocacy over a substantial period of time and commits himself in the public mind, he jeopardizes his ability to make fair determinations and in extreme cases, such as we have here, he should be disqualified from subsequently posing as a fair decisionmaker on the subject of his advocacy.

At pages ——, —— of 201 U.S.App.D.C., pp. 1170–1171 of 627 F.2d the majority opinion concludes:

Accordingly, a Commissioner should be disqualified only when there has been a clear and convincing showing that the agency member has *an unalterably closed mind on matters critical to the disposition of the proceeding.* The 'clear and convincing' test is necessary to rebut the presumption of administrative regularity. *See, e. g., Withrow v. Larkin*, 421 U.S. 35, 55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Hercules, Inc. v. EPA*, 194 U.S.App.D.C. 172, 204, 598 F.2d 91, 123, (D.C. Cir. 1978). The 'unalterably closed mind' test is necessary to permit rulemakers to carry out their proper policy-based functions while disqualifying those unable to consider meaningfully a section 18 hearing.

421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (Emphasis added).

However, while the majority cites *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), that case does not apply the "unalterably closed mind standard." *Withrow* involved a Wisconsin statute prohibiting various acts of professional misconduct by physicians. The act empowers the State Examining Board to warn and reprimand physicians, and thereafter to temporarily suspend licenses and institute civil action to revoke a license or initiate criminal action. Following its investigation, the Board notified a licensed physician that a closed investigation would be held to determine whether he had engaged in certain proscribed acts. At that juncture the doctor brought an action against the Board seeking injunctive relief against the hearing on the ground that in deciding to proceed against him the Board had prejudged his case and would therefore be disabled from hearing and deciding his case on the basis of evidence to be presented at the subsequently scheduled contested hearing. In determining the standard to be applied to the Board in such circumstances the Court remarked:

No specific foundation has been presented for *suspecting* that the Board had been prejudiced by its investigation or would *be disabled from hearing and deciding on the basis of the evidence to be presented at the contested hearing.* The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to *impugn the fairness of the Board members at a later adversary hearing.* Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual

discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941).

421 U.S. at 55, 95 S.Ct. at 1468 (Emphasis added). *Withrow* thus suggests a "fairness" standard; i. e., whether there is any ground for *suspecting* the Board of such *unfairness* that it could not hear and decide the case on the basis of the evidence to be presented at the contested hearing.[10] If the 1948 decision in *Federal Trade Commission v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) is construed as establishing an irrevocably closed mind standard, the subsequent decision in *Withrow* must be recognized as modifying that rule.

The "unalterably closed mind" standard is also basically inconsistent with the holding that only *fair* decisionmakers may promulgate rules. Unfairness may exist in many instances where the Commissioner's mind is short of being "unalterably closed". The disqualification standard should be high, but not that high.

## VIII. THE STANDARD FOR DISQUALIFICATION.

Because of the deficiencies pointed out above, I would reject the unalterably closed mind standard as imposing a practically impossible impediment in a great many cases to a showing of bias, even when the decisionmaker has in fact made up his mind in advance of the hearing.[11] It is an unfair method of determining unfairness. Instead, I suggest that a superior standard can be gleaned from recent Supreme Court holdings, from a frank appraisal of the ex-

10. In a similar vein, in *Home Box Office v. FCC,* 185 U.S.App.D.C. 142, 567 F.2d 9 (D.C. Cir.1977), we concluded that the consideration by the FCC of off the record evidence in a rulemaking proceeding, through ex parte contacts, violated "fundamental notions of fairness".

11. The factual situation would have to be as extreme and as public as the Chairman's conduct here to prove the required bias. The standard for juror disqualification referred to in the concurring opinion, (text accompanying note 2) is not stated fully by asserting that the test is merely whether the juror feels he can *lay aside* his impression or opinion and render a verdict based on the evidence presented in court. The true test is whether he can lay aside his opinion *before* the case starts. *Irvin v. Dowd,* 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961) found the jury improperly constituted where some jurors admitted "that it would take evidence to overcome their belief" in the defendant's guilt. From this it appears that the court was applying a threshold standard. *See also Beck v. Washington,* 369 U.S. 541, 557, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), referred to in *Murphy v. Florida,* 421 U.S. 794, 802, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). In *Beck,*

> each [of the persons . . . selected for the trial jury] indicated that he was not biased, that he had formed no opinion as to the petitioner's guilt *which would require evidence to remove,* and that *he would enter the trial* with an open mind disregarding anything he had read in the case."

369 U.S. at 557, 82 S.Ct. at 964. (Emphasis added). The last requirement is essential and should *not* be overlooked. The court in *Beck* clearly applied a threshold test that would have disqualified a juror if he "enter[ed] the trial . . . [with an] opinion . . . which would require evidence to remove." *Id.* This is the only fair and workable standard because otherwise jurors who had opinions they thought they could set aside *after the evidence was in* would convict a defendant if he did not put in any evidence. An identical threshold test was applied throughout the Teapot Dome trial of Albert B. Fall, Secretary of the Interior in the Harding administration. *See* the record in that case. *Fall v. U. S.,* 60 App.D.C. 124, 49 F.2d 506, *cert. denied,* 283 U.S. 867, 51 S.Ct. 657, 75 L.Ed. 1471 (1931).

The concurring opinion also incorrectly states (text accompanying note 3) that the "unalterably closed mind" standard is similar to that employed for the disqualification of judges. The applicable United States statute requires the disqualification of judges on much lesser grounds. It provides that:

> "[a]ny justice, judge, magistrate . . . of the United States *shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned" and "*shall* also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . ." 28 U.S.C. § 455, 88 Stat. 1609, (emphasis added).

28 U.S.C. § 455, 88 Stat. 1609. (emphasis added).

If that standard were applicable, there are certainly reasonable grounds for questioning the Chairman's impartiality.

tent to which the Magnuson-Moss proceedings in this case require adjudicative determinations, and from considerations of fairness that must be said to be implicit in the structure of any statutory tribunal that is held out to the public as acting in accordance with the substantial evidence presented at public hearings.

The Supreme Court's decisions in *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) and *Hortonville Joint School District No. 1 v. Hortonville Ed. Ass'n*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976), each cited by the majority, hold that fairness is the ultimate measure of the qualification of an arbiter.

In *Withrow*, Justice White stated:

[I]f the initial view of the facts based on the evidence derived from nonadversarial processes *as a practical or legal matter foreclosed fair and effective consideration* at a subsequent adversary hearing leading to ultimate decision, a substantial due process question would be raised. . . . [T]hat the combination of investigative and adjudicative functions does not, without more, constitute a due process violation, does not, of course, preclude a court from *determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high.* 421 U.S. at 58, 95 S.Ct. at 1470 (emphasis added).

In *Hortonville*, Chief Justice Burger quoted from *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) in pointing out certain circumstances in which disqualification would be justified:

Nor is a decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, *in the absence of a showing that he is not "capable of judging a particular controversy fairly on the basis of its own circumstances."*

426 U.S. at 493, 96 S.Ct. at 2314 (Emphasis added).

That both of these cases involve consideration of disqualification of decisionmakers from *adjudications* does not deprive them of value in formulating a standard for disqualification from the Magnuson-Moss rulemaking that is involved here. As discussed *supra*, this Magnuson-Moss rulemaking contains many elements of adjudication—and in any event the majority admits that each of the decisionmakers must be *fair*. The fairness required stems not solely from constitutional due process considerations, but from the Congressional design of the statutory proceedings.

This design dictates concern not only for the FTC Chairman's duty to serve as policymaker as well as decisionmaker, a concern embraced by the majority, but also requires recognition of the rights of the public and those who appear before the Commission. It follows logically, then, that where the contestants of a proposed rule have the right to present evidence at a hearing on disputed issues of material fact, as in a Magnuson-Moss rulemaking proceeding, they necessarily have a correlative right to have their evidence heard by a decisionmaker who will give it fair and impartial consideration.

This is not to say that a Commissioner is necessarily to be disqualified if he (or she) has expressed opinions on policy matters that are later involved in Commission rulemaking. Rather, the moving party must show by a preponderance of the evidence that the decisionmaker could not participate fairly in the formulation of the rule because of substantial bias or prejudgment on any critical fact that must be resolved in such formulation. Such proof will be greatly aided where, as here, the decisionmaker's public statements repeatedly reveal fixed conclusions upon the primary issue that the agency proceeding contemplated would only be determined *after* the hearing. Such standard for disqualification accords with the underlying principles that were applied in *Withrow* and *Hortonville, supra*.

Chairman Pertschuk over a substantial period of time, on the very matter here presented, has made numerous appearances as a vigorous public advocate "committed" to curing the "evils" and "moral myopia" evident in the "exploitation" of children's advertising on TV. Even applying the ma-

jority's stiff test for disqualification, such conduct and expressions from his own mouth and pen, as near as words and conduct can, indicate an "irrevocably closed mind" and prejudgment of the ultimate fact involved—the "evil" of such advertising—and he should recuse himself; failing this the court should order his disqualification from participation in the proceedings. He has proved that he is not an impartial decisionmaker on this matter.

For the foregoing reasons I respectfully dissent against the result reached by the majority.